Laramore, Judge,
delivered the opinion of the court:
This is an action for the recovery of Federal income taxes, plus interest thereon, alleged to have been illegally collected from plaintiffs by the defendant in the amount of $14,226.81 for the calendar year 1955, and in the amount of $24,124.08 for the calendar year 1956.
Taxpayers, husband and wife, residents of Phoenix, Arizona, are the sole proprietors of a wholesale plumbing and heating supply business located in Phoenix, Arizona, and known as “Phoenix Pipe and Supply Co.”. Both Mr. and Mrs. Ehlen have been active in the management and affairs of the company since its inception. Mr. Ehlen managed the purchasing and selling and Mrs. Ehlen managed the finances and accounting, including the billing and collection of accounts receivable.
Phoenix Pipe and Supply Co. engages in the selling of plumbing and heating materials and equipment at wholesale, and the majority of its customers are plumbing and heating *37 contractors. It also sells to commercial buildings and public institutions. During the years in question, approximately 95 percent of gross sales made by the business were charge sales or sales made on credit terms.
From the inception of the business in 1938 taxpayers have kept the company’s books and records on the accrual basis of accounting, have used a calendar year, and have employed the reserve method of accounting for bad debts. Such reserve method is authorized for tax purposes by section 166 (c) of the Internal Revenue Code of 1954, 26 U.S.C. (I.R.C. 1954) § 166(c) (1958 Ed.), which reads as follows:
(c) Reserve for had debts. — In lieu of any deduction under subsection (a) there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.
From 1938 through 1951, Mrs. Ehlen estimated the amount of the beginning reserve for bad debts by means of analyzing all the outstanding accounts receivable. She then added an amount to the reserve balance sufficient to offset the amount of existing accounts she thought would be uncollectible. By the end of 1951, in using the aforementioned method, the business had developed a reserve balance of $39,187.88 on its books.
During 1952, taxpayers’ income tax returns were audited for the taxable years 1949 and 1950, and Internal Eevenue Agent E. J. Harén determined that the aforesaid 1951 reserve balance was excessive. Agent Harén conferred with Mrs. Ehlen and her accountant who prepared plaintiffs’ tax returns. It was agreed that the reserve balance of $39,187.88 should be reduced by $14,187.88 to $25,000 and that for the time being the future reserve balance should be computed at two and one-half percent of charge sales. The decrease in the reserve was added to income reportable by taxpayers, one-half in 1949 and one-half in 1950, and the additional taxes necessitated by this increase in income were paid by plaintiffs.
After December 31,1951, taxpayers maintained a reserve balance equal to two and one-half percent of charge sales or $25,000, whichever was higher. Under this formula the reserve for bad debts increased from $25,000 on December *38 31,1951, to $31,869.57 on December 31,1956, and to $44,489.61 on December 31,1959.
During 1955 and 1956, the years in issue, taxpayers claimed bad debt deductions of $15,340.94 and $27,869.41, respectively, as additions to the company’s reserve for bad debts. These amounts represented for each year the total of actual bad debt write-offs, minus previous write-offs recovered, plus an amount necessary to bring the reserve balance to two and one-half percent of charge sales for the year.
During 1958, the aforesaid income tax returns were audited by Internal Revenue Agent John J. Yogt, who proposed disallowing all of taxpayers’ bad debt deductions for 1955 and all but $163.31 for 1956. The reasons for Agent Yogt’s proposals were stated by him as follows:
The taxpayers have adopted the reserve method of treating bad debts and in accordance with Section 166-6 [sic] are entitled to a reasonable addition to the reserve for bad debts. A reasonable addition has been computed on past experience in accordance with the formula set forth in the Black Motor Co., Inc. Case, 41 B.T.A. 300. Rapid collection of a substantial percentage of bad debts indicates that some accounts are being written off too rapidly. * * *
The plaintiffs had calculated their bad debt deduction of $15,340.94 for 1955 in the following manner: First they determined that $16,203.74 of accounts receivable were un-collectible and should be written off in 1955. This amount, however, was reduced by $5,551.22 which represented receivables written off in previous years but which were recovered in 1955. Plaintiffs then determined that the 1955 ending reserve balance for bad debts should be $30,739.56 which equaled two and one-half percent of 1955 charge sales and which percentage had been suggested by Agent Harén in 1952 as a method of computing the reserve. Their bad debt deduction of $15,340.94 was then arrived at by deducting their net accounts receivable write-offs from their ending 1954 reserve balance of $26,051.14 and then computing the amount needed to be added to the reserve to bring it up to $30,739.56.[1]
*39 In his 1958 audit, Revenue Agent Vogt concluded that the plaintiffs only suffered $6,490.95 worth of uncollectible accounts in 1955, and he reduced this amount by plaintiffs’ recoveries of $5,551.22 to arrive at a net bad debt write-off of $939.76 for 1955. He then used the Black Motor Co. formula and computed the ratio of plaintiffs’ net bad debts for the 5-year period, 1951 to 1956, to plaintiffs’ charge sales for the same period.[2] He applied this ratio of .0010278 to plaintiffs’ 1955 charge sales, which resulted in the sum of $1,263.76. This was thus an averaged amount which based on plaintiffs’ past five years’ experience could be expected to be suffered as bad debts in the next year. For additional protection, Agent Vogt added to this figure the net bad debts he had concluded that plaintiffs suffered in 1955, $939.76, and arrived at the sum of $2,203.52, which was thus the ending reserve balance Vogt considered adequate for 1955. As plaintiffs already had a reserve large enough to absorb its accounts receivable write-offs in 1955 and still retain a balance greatly in excess of $2,203.52 at the end of 1955, Vogt disallowed plaintiffs’ bad debt deductions for 1955.[3]
In 1956 plaintiffs had written off uncollectible accounts receivable in the amount of $33,823.20 which, with recoveries, amounted to a net write-off of $26,739.40. They then determined that they were entitled to an ending reserve balance of $31,869.57 and, therefore, reported a net bad debt deduction of $27,869.41. Agent Vogt, however, found that plaintiffs only suffered uncollectible accounts receivable in the amount of $22,260.42 in 1956 which, with recoveries, amounted to a net loss of $18,286.65. Using the Black Motor Co. formula, Agent Vogt then determined that plaintiffs were entitled to an ending reserve balance of $24,010.93 for 1956. He allowed them a bad debt deduction of $163.31 *40 for 1956. Defendant now contends that Agent Vogt’s allowance of the had debt deduction of $163.31 was erroneous in that Vogt erred in subtracting $2,203.52 instead of $939.76 from plaintiffs’ ending reserve balance of $26,051.14 for 1954 so that he erroneously arrived at the figure of $23,847.62 as being in the reserve at the end of 1955. Thus he allowed plaintiffs a deduction of $163.31 to bring their reserve up to his estimated amount of $24,-010.93. Defendant contends that plaintiffs actually already had a balance of $25,111.38 ($26,051.14 minus $939.76) at the end of 1955 and no deductions were needed during 1956 to cover the estimated needed reserve amount of $24,010.93. However, defendant does not take issue in regard to this error, but only points out what occurred in order to contradict a certain contention of plaintiffs which is considered later in this opinion
On September 12, 1958, the Commissioner of Internal Revenue issued to plaintiffs a statutory notice of deficiency for both 1955 and 1956. On December 12, 1958, plaintiffs paid said asserted deficiencies in the total amount of $34,-686.62. On January 2, 1959, plaintiffs paid the District Director the sum of $4,146.93, representing the interest determined to be due on said deficiencies. On February 10, 1959, plaintiffs duly filed claims for refund, which claims were formally disallowed on June 23, 1959, and this suit was timely filed thereafter.
Plaintiffs contend that the Commissioner of Internal Revenue acted arbitrarily and unreasonably in disallowing plaintiffs’ claimed bad debt deductions for 1955 and 1956, and that the Commissioner thus abused the discretion granted him under section 166(c) of the 1954 Internal Revenue Code. Plaintiffs’ contention primarily rests upon their allegation that Revenue Agent Vogt’s disallowance of some of their write-offs of accounts receivable in 1955 and 1956 were not based upon proper considerations.
In determining plaintiffs’ reserve for bad debt requirements, Agent Vogt only considered the past bad debt experience of their business, which was reflected by the moving average formula he applied. In disallowing some of the plaintiffs’ accounts receivable write-offs, Agent Vogt appar *41 ently only considered the fact that plaintiffs experienced a high recovery rate of accounts receivable which had been written off in previous years. He did not make an analysis of the nature of plaintiffs’ business, nor did he consider the local business conditions, nor did he give any effect to the earlier arrangement between plaintiffs and Agent Harén in 1952. Therefore, plaintiffs claim that his procedure in determining which accounts of plaintiffs were -uncollectible was contrary to the conditions set forth in Mitchell-Huron Production Credit Ass’n. v. Welsh, 163 F. Supp. 883, 886-887 (D.C.S.D. 1958), wherein the court stated:
The Commissioner having made deductions from gross income, substantially lower than those of the plaintiffs, the question arises as to whether he abused his discretion. This court is convinced that he did, because of the reasons assigned for the conclusions already reached; because of admissions of the author of the Commissioner’s deduction findings, who testified that they were based on his own conclusions; that he did not look at a lot of the taxpayers’ loans; that he did not know anything about security behind specific loans; that he gave no consideration to other audits of the taxpayers; that he disregarded past experiences of other lending agencies; that his conclusions in the main were bottomed on negligible losses had by the taxpayers since they were first organized and that he refused to recognize the loss experience of lenders, as a prosperity level falls.
Aside from such negatives there is * * * specific affirmative proof of disdain of relevant facts, operations under a rule of thumb, and a trampling, under shelter of “discretion”, on taxpayers’ rights. “Discretion”, when chained to relevant facts, safeguards the taxpayers as it protects the government. Without such restriction, it can and must not be tolerated.
In Paramount Liquor Co. v. Commissioner, 242 F. 2d 249, 251 (C.A. 8,1957), the Court of Appeals for the Eighth Circuit had this to say about the general intent of the statutory provision permitting a deduction for a reasonable addition to the bad debt reserve:
Considering the purpose and method of the Statute, its operation involves an estimate by the taxpayer based upon his experience in the business as well as his knowledge of more general current situations which might *42 react upon the credit situation in his business. Such estimates are within the educated discretion of the taxpayer subject only to the outer boundary control of the Commissioner as to reasonableness. Determination of this “reasonableness” is expressly lodged in the “discretion” of the Commissioner.
Thus we are called upon to determine whether the Commissioner of Internal Revenue, in the exercise of his statutory discretion, has acted reasonably in disallowing plaintiffs’ addition to their reserve as described above. As we have previously held, in making this determination, it is not enough for plaintiffs to prove that their method of computing their bad debt reserve was reasonable. The crucial burden which plaintiffs must bear is to show that the Commissioner was unreasonable and hence abused his discretion. The Paramount Finance Co. v. United States, 157 Ct. Cl. 824, 832, 304 F. 2d 460, 464 (1962). In our opinion the plaintiffs here have failed to meet that burden.
Various considerations may properly influence a businessman in the determination of proper additions to the contingency reserves deemed necessary for a prudent conduct of the business, and there are, of course, numerous accounting methods by which this may be accomplished. From the standpoint of obtaining the tax deduction, however, it cannot be overlooked that the applicable statute places the reasonableness of the addition to a bad debt reserve within the “discretion of the Secretary or his delegate.” While, of course, he must not abuse such discretion, Mitchell-Huron Product Credit Ass’n. v. Welsh, sufra, we do not believe he has done so in the present case.
In determining plaintiffs’ reserve requirement for bad debts, Revenue Agent Vogt gave no binding effect to an agreement between plaintiffs and another revenue agent some years previously that a reasonable reserve percentage at that time would be about two and one-half percent of plaintiffs’ charge sales.[4] Instead, he considered only plaintiffs’ bad debt experience for the preceding five years and derived a much smaller ratio of bad debts to charge sales by the use *43 of the moving average formula originally approved in Black Motor Co., Inc., supra. Furthermore, in arriving at his determination that plaintiffs’ reserve balance at December 31, 1954, required no addition thereto, he disallowed some $9,700 of plaintiffs’ 1955 bad debt write-offs, and some $11,500 of plaintiffs’ bad debt write-offs for 1956. In so doing, Agent Vogt apparently gave great weight to plaintiffs’ high recovery rate for accounts receivable written off in previous years. Unlike Mrs. Ehlen, he does not appear to have made any specific analysis of the write-offs so disallowed to plaintiffs. These actions by Agent Vogt are claimed by plaintiffs to be so arbitrary as to amount to an abuse of discretion. We disagree.
It cannot be overlooked that of the bad debt write-offs by plaintiffs for the period 1938 through 1959, over 50 percent of such write-offs were actually recovered. This remarkable recovery rate indicates to us rather clearly that Agent Vogt was correct in his observation in the deficiency notice that “some accounts are being written off too rapidly.” While, in considering the collectibility of their accounts receivable, taxpayers need not be incorrigible optimists, neither should they be confirmed pessimists. As shown by our finding 9, it might well be possible for reasonable persons to disagree as to the collectibility of any particular account receivable of plaintiffs, and yet to see clearly that on an overall basis plaintiffs’ extreme pessimism as to collectibility of their accounts receivable resulted in a constantly increasing and overstated reserve balance. For example, in 1955 plaintiffs determined that $16,203.74 of accounts receivable were uncollectible, whereas actually only $6,741.95 of those accounts were eventually not paid. The Agent’s allowance of about $6,500 in write-offs for 1955 was much more realistic and reasonable.
Plaintiffs say, however, that we must not look at subsequent years for the purpose of determining the adequacy of the reserve, and refer us to our decision in the case of The Paramount Finance Co., supra. It is true that we there said that a determination of a reasonable addition to a bad debt reserve should be made “in the light of the facts existing at the close of the taxable year.” There, however, we were not concerned, as we are here, with a continuous pattern of *44 premature write-offs both prior to and subsequent to the taxable years. That Agent Vogt was concerned with this overall pattern, rather than a consideration of events in subsequent years, is evidenced by the fact that he permitted the write-offs of some accounts which by the time of his audit in 1958 he knew had been already recovered. We think these considerations distinguish the present case from that of The Paramount Finance Co. case, as well as the Tax Court cases cited by plaintiffs. See also Paramount Liquor Co. v. Commissioner, supra, where the Court of Appeals, in determining the adequacies of the taxpayer’s reserve for 1949, looked at its actual bad debts for the preceding three years and also for the subsequent two years. Furthermore, while subsequent events are not the test as to the adequacy of the reserve, the court is not required to blind itself to the actual facts.[5] When hindsight now tells us that what Agent Vogt did proved to be a more nearly correct and realistic formula, that fact moves us to the conclusion that the Commissioner of Internal Bevenue did not abuse the discretion vested in him.
Plaintiffs .further contend that their additions to the reserve during both years in question were reasonable because they consistently used the two and one-half percent of charge sales computation which Agent Harén recommended in 1952. However, that is not the issue in this case. Whether the action taken by the taxpayers is reasonable or not is irrelevant. The question to be decided is whether the determination made by the Commissioner is reasonable and thus not an abuse of his statutory discretion. It does not necessarily follow that merely because the method used by the taxpayers was reasonable, the determination made by the Commissioner was therefore unreasonable. See The Paramount Finance Co. v. United States, supra. Although Agent Haren determined in 1952 that as of that time two and one-half percent of charge sales was a reasonable reserve requirement, we reaffirm our holding in The Paramount Finance case that such a determination is not binding on future evaluations of a taxpayer’s reserve requirements by the Commissioner. See *45 also Art Metal Construction Co. v. United States, supra. Similarly, the Tax Court recently disallowed a portion of the taxpayer’s deductions for additions to its bad debt reserve, even though the bank had followed strictly the provisions of Min. 6209, 1947-2 C.B. 26, in computing its deduction. The Central Bank Co., 39 T.C. 856 (1963). The court reiterated its position that Min. 6209 is merely an administrative guide and does not have the force of law in computing bad debt reserve allowances under section 166. Thus, the court reasoned that where the taxpayer’s reserve appears to be unreasonably large in relation to its actual bad debt experience, additions to it could properly be disallowed and the Commissioner would not be abusing his statutory discretion.
We believe that in applying the Black Motor Co. formula, which took into consideration plaintiffs’ bad debt experience for the prior 5-year period, the Commissioner exercised reasonable discretion, calculated as objectively as possible to insure plaintiffs an adequate reserve, but also to prevent plaintiffs from building up an overstated and excessive reserve with consequent overstatement of their bad debt deductions.
Plaintiffs further argue that the Commissioner’s disallowance of additions to their reserve for bad debts in 1955 and 1956 resulted in opening up taxable years closed by the statute of limitations because it tended to eliminate their reserve which was built up in years already closed by the statute. We consider this argument untenable in that section 166(c) of the Internal Revenue Code of 1954 only allows a deduction for a reasonable addition to the reserve, and if the reserve is already unreasonably large, due to unnecessarily large additions in prior years, the statute does not require this past error to be continued in .succeeding years by requiring further unnecessary additions to an already swollen reserve. The statute of limitations bars inquiry into excessive additions in years closed by the statute, but it does not prevent the Commissioner from disallowing additions to the reserve in years not closed by the statute when such additions are not needed.
Plaintiffs finally argue that the Commissioner’s disallowance of their deductions in 1955 and 1956 acted to reduce *46 their reserve to a negative figure which they contend is clearly an abuse of discretion. Their argument is based on the fact that Agent Vogt in his original calculations allowed plaintiffs a deduction of $163.31 to bring their reserve up to the amount he calculated it should be at the end of 1956. Thus plaintiffs claim they had a negative reserve balance at the end of 1956.
On the other hand, the defendant maintains that plaintiffs did not end with a negative reserve balance as a result of the disallowance of plaintiffs’ bad debt deductions in 1955 and 1956'. The defendant illustrates that plaintiffs had a reserve balance at the end of 1956 in the amount of $6,988.04 by the following schedule:
Ending reserve balance 12/31/54_______________________$26, 051.14
Losses charged to reserve in 1954----------- $6, 490. 98
Less recoveries in 1955---------------------- 5, 551. 22
Net bad debts allowed for 1955________________________ 939. 76
25, 111. 38
Addition to reserve allowed in 1955--------------------- 0
Reserve balance 12/31/55------------------------------ 25, 111. 38
Losses charged to reserve in 1955-----------$22, 260.42
Less recoveries in 1956---------------------- 3, 973. 77
Net bad debts allowed for 1956________________________ 18,286. 65
6, 824. 73
Addition to reserve allowed in 1956--------------------- 163.31
Reserve balance 12/31/56_____________________________ [6] 6, 988. 04
We agree with defendant’s showing of a reserve balance at the end of 1956. Plaintiffs’ contention that they had a negative reserve balance is based upon an erroneous understanding of the moving average formula and the nature and function of the reserve for bad debts. The purpose of the reserve is to allow taxpayers a reasonable deduction in the current year or an estimate of the bad debts that will not become known until later but which arise out of current *47 transactions. The moving average formula is simply one of several reasonable methods used to arrive at such estimate.
At the end of 1955, plaintiffs calculated that they would need a reserve balance of $30,739.56 to meet their anticipated losses in 1956. Using the moving average formula, Agent Vogt calculated that they would only need a reserve balance of $24,010.93. Defendant asserts that Agent Vogt erred in allowing plaintiffs a 1956 bad debt deduction of even $163.31 because plaintiffs already had a reserve balance of $25,111.38 at the end of 1955 and, therefore, did not need any further deduction in 1956. Defendant’s explanation of the agent’s mathematical error appears to be valid, but in any event, even if Agent Vogt had not miscalculated, a glance at the above schedule will demonstrate that plaintiffs did not end the year 1956 with a negative balance, but rather with a substantial reserve of about $6,825. It appears to us that, starting from this point and, in future years, making consistent use of the moving average formula, plaintiffs’ resulting reserve balances will be more realistic and in line with their actual bad debt experience. By contrast, note the steadily increasing and unneeded reserve balances developed by plaintiffs’ formula, as shown in Appendix A to our findings of fact, particularly for the years 1957 through 1959.
Since we have determined that the Commissioner of Internal Bevenue exercised reasonable discretion in his dis-allowance of some of plaintiffs’ write-offs for the years 1955 and 1956, and in his utilization of the Black Motor Co. formula to estimate plaintiffs’ required reserve balances for 1955 and 1956, the Commissioner’s disallowance of plaintiffs’ addition to the reserve for 1955 and 1956 did not constitute an abuse of discretion. Therefore, plaintiffs are not entitled to recover, and their petition accordingly is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, and the briefs and argument of counsel, makes findings of fact as follows:
1. This is a suit for the recovery of Federal income taxes, plus interest thereon, alleged to have been illegally collected from plaintiffs by the defendant in the amount of $14,226.81 *48 for the calendar year 1955 and in the amount of $24,124.08 for the calendar year 1956.
2. Plaintiffs, Henry O. and Ada E. Ehlen, are husband and wife, residing in Phoenix, Arizona. Since 1938, plaintiffs have been the sole proprietors of a wholesale plumbing and heating supplies business located in Phoenix, and known as “Phoenix Pipe & Supply Co.”, sometimes hereinafter referred to as “the business.” From the inception of the business, both Mr. and Mrs. Ehlen have been active in its management and affairs. Mr. Ehlen has always managed the purchasing and selling affairs of the business, and Mrs. Ehlen has always managed its financial and accounting affairs, including the billing and collection of accounts receivable.
Phoenix Pipe & Supply Co. engages in the selling of plumbing and heating materials and equipment at wholesale, and the majority of its customers are plumbing and heating contractors. It also sells such materials and equipment to commercial buildings and public institutions. During the years in question, approximately 95 percent of gross sales made by the business were charge sales, or sales made on credit terms.
3. From the inception of the business, plaintiffs have kept the books and records of the Phoenix Pipe & Supply Co. on the accrual basis of accounting with a fiscal year of January 1-December 31. Also, from the inception of the business, plaintiffs have used the reserve method of accounting for the bad debts of the business in lieu of the specific charge-off method of deducting bad debts which become worthless within a taxable year. Such reserve method is authorized for tax purposes by Section 166 (c) of the Internal Revenue Code of 1954 reading as follows:
(c) Reserve for bad debts. — In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.
The historical experience of the business with such reserve method of accounting for its bad debts, covering the years 1938-1959, inclusive, together with its actual write-offs and recoveries of bad debts, its charge sales, and ending accounts *49 receivable balances are set forth in Appendix A, attached hereto and made a part hereof.
4. During the period 1938 through 1951, Mrs. Ehlen made an annual end-of-the-year analysis of all outstanding accounts receivable and estimated the amount of reserve which she felt was necessary to offset the amounts of those accounts which she thought probably would prove to be uncollectible, in whole or in part. From this estimated amount she subtracted the existing reserve balance on the company’s books in order to arrive at the amount which should be added to the reserve for that year. Such addition to the reserve plus year-end write-offs, less recoveries realized during the year on accounts previously written off, was the net bad debt expense for the particular year claimed on plaintiffs’ tax returns as a bad debt deduction.[7] By the end of 1951, Mrs. Ehlen, in using the aforesaid method of accounts receivable analysis, had developed a reserve balance on the books of the business aggregating $39,187.88. During the course of an audit in 1952 of plaintiffs’ Federal income tax returns for the taxable years 1949 and 1950, Internal Eevenue Agent E. J. Harén determined that the aforesaid 1951 reserve balance was excessive. He conferred with Mrs. Ehlen and her certified public accountant, George E. Pool, who had prepared plaintiffs’ tax returns. It was agreed that the reserve balance of $39,187.88 should be reduced by $14,187.88 to $25,000 and that, for the time being, the future reserve balances should be computed at 2y2 percent of charge sales. The revenue agent’s report stated as follows:
It is to be noted that for the period from 1945 to 1951 the percentage of write-offs has not exceeded 2% at any time. During this same period the percentage of reserve to charge sales has risen from 1% to over 4% which would appear to be excessive. Upon discussion it was agreed that at the present time a more reasonable reserve percentage would be about 2y2 percent of the charge sales which would reduce the reserve balance at the end of 1951 from $39,187.88 to $25,000.00 a difference in total of $14,187.88. (The exact percentage figure of this ad *50 justment would make the percent of reserve to charge sales 0.02618.)
The 2i¿> percent figure was arrived at due to the amount of large accounts that are doubtful on the books at this time and would appear to be very ample for any emergencies. The taxpayers have agreed to use this figure in the future rather than to pick a figure at random as an addition to the reserve. It was further agreed that the $14,187.88 should be returned to income, one-half in this year in the above amount of $7,093.94 and one-half in 1950. (See Schedule 4 — A.) In the event that future years show the 2% percentage to either be too low or too high further consideration may then be afforded the reserve.
The aforesaid decrease of $14,187.88 in the reserve balance was divided equally and $7,093.94 thereof was added to the income reported by plaintiffs for the year 1949 and the same amount was added to the income reported by plaintiffs for the year 1950, resulting in additional taxes in the amount of $4,841.52 for the year 1949 and $4,841.62 for the year 1950. These additional taxes were paid by plaintiffs.
5. After December 31, 1951, plaintiffs maintained reserve balances of 2y2 percent of charge sales, or $25,000, whichever was higher, in the belief that this was a continuing formula which had been prescribed by agreement with the revenue agent. Because of increasing charge sales, the use of this formula caused the reserve for bad debts to increase from $25,000 on December 31, 1951, to $31,869.57 on December 31, 1956, to $44,489.61 on December 31, 1959. (See Column 5, Appendix A.)
6. Using the foregoing 2% percent formula, the plaintiffs computed their addition to the bad debt reserve and their bad debt deduction for the year 1955 in the following maimer:
Reserve (2%% of 1955 charge sales)------------------ $30, 739.56
Less: Reserve balance, 12/31/54__________________ 26, 051.14
Addition to reserve 4, 688.42
Add: Write-offs______________________ $16,203.74
Less: Recoveries_____________________ 5, 551.22 10, 652. 52
Bad Debt Deduction for 1955_____________________ 15,340.94
*51 The plaintiffs computed their addition to the bad debt reserve and their bad debt deduction for the year 1956 in the following manner:
Reserve (2%% of 1956 charge sales)------------------ $31, 869. 57
Less: Reserve balance, 12/31/55------------------ 30,739.56
Addition to reserve 1,130.01
Add: Write-offs______________________ $33,823.20
Less: Recoveries_____________________ 7,083.80 26, 739.40
Bad Debt Deduction for 1956__________________________ 27, 869.41
7. On their joint income tax returns, timely filed, for the years 1955 and 1956, plaintiffs claimed bad debt deductions as computed above in the respective amounts of $15,310.91 and $27,869.11. During 1958, the aforesaid income tax returns were audited by Internal Eevenue Agent John J. Vogt, who proposed substantial adjustments to plaintiffs’ bad debt reserve, and stated the reasons for his proposals as follows:
The taxpayers have adopted the reserve method of treating bad debts and in accordance with Section 166-6 [sic] are entitled to a reasonable addition to the reserve for bad debts. A reasonable addition has been computed on past experience in accordance with the formula set forth in the Black Motor Co., Inc. Case, 11 B.T.A. 300. Eapid collection of a substantial percentage of bad debts indicates that some accounts are being written off too rapidly. * * *
In disallowing the entire bad debt deduction of $15,310.91 claimed by plaintiffs for 1955, Revenue Agent Vogt used the so-called moving average formula for computing proper additions to the reserve as approved (with minor variations) by the United States Board of Tax Appeals (now the Tax Court of the United States), in the case of Black Motor Co., Inc., 11 BTA 300. His first step in applying such formula was to adjust the 1955 bad debt write-offs by plaintiffs in the amount of $16,203.71 by restoring to collectible accounts receivable three accounts written off by plaintiffs totaling $9,712.79. (See finding 9, infra.) After this adjustment to 1955 write-offs, the total write-offs for the entire five-year period, 1951-1955, amounted to $29,821.61, from which the agent deducted total recoveries for those same years amounting to $21,575.75, thus arriving at a “net bad debt” figure for *52 the five-year period of $5,245.86. He then totaled the charge sales for the same five-year period and calculated a ratio of net bad debts to charge sales of .0010278.[8] The foregoing computations may be summarized in schedule form as follows:

Ratio of net bad debts........................................... $5,245.861 0010278
to charge sales:..................................................$5,103,837.60]
After obtaining the above ratio, Agent Vogt used it to compute his adjustment to plaintiffs’ 1955 reserve as follows:
Charge sales for 1955 of $1,229,582.56 x .0010278 equals________________________ $1,263. 76
Add:
Losses charged to reserve_____________ $6,490. 98
Less recoveries in 1955_________________ 5, 55L 22 939. 76
Total reserve requirement for 1955_______________ 2,203.52
Reserve as of December 31,1954------------------ 26, 051.14
Allowable addition to reserve__________________________ None
Bad debts claimed per return--------------------------- 15, 340.94
Adjustment (disallowed as excessive)__________________ 15,340.94
8. For the year 1956, Agent Vogt used the identical method described above. For that year, however, he adjusted plaintiffs’ bad debt write-offs for 1956, aggregating $33,823.20, by restoring to collectible accounts receivable five accounts *53 written off by plaintiffs in the total amount of $11,572.78. (See finding 9, infra.) This adjustment reduced allowable 1956 write-offs to $22,260.42, and the calculation of the ratio is as follows:

Ratio of net bad debts........................................... $24,354.441
-} =0.0044904
to charge sales___________________________________________________$5,423,723.42J
After obtaining the above ratio, Agent Vogt used it to compute his adjustment to plaintiffs’ 1956 reserve as follows:
Charge Sales for 1956 of $1,274,782.76X.0044904 equals___ $5,724.28
Add: Losses charged to reserve------------ $22,260. 42
Less recoveries in 1956----------- 3, 973. 77
-- 18,286. 65
Total reserve requirement for 1956--------------- 24, 010. 93
Reserve as of December 31, 1955----------------- 23,847. 62
Allowable addition to reserve-------------------------- 163.31
Bad debts claimed per return-------------------------- 27,869.41
Adjustment (disallowed as excessive)------------------ 27,706.10
9. In making the foregoing computations for both years here involved, Agent Vogt considered only the past bad debt experience of the business for the years 1951-1956, inclusive, as reflected in its books and records after his adjustments described below. He made no analysis of the nature of the particular business involved, nor of local business conditions existing during the two years involved, nor did he give any effect to the earlier arrangement between plaintiffs and Agent Harén for the year 1951, as described in finding 4, supra.
He disallowed as bad debt write-offs and restored to collectible accounts receivable the following accounts:

*54

He had made the general statement in his report that “rapid collection of a substantial percentage of bad debts indicates that some accounts are being written off too rapidly.” However, the record does not disclose his reasons for selecting the write-offs of these particular accounts for disallowance. For all that appears, his selection of accounts for disallowance seems to have been made at random. As a matter of hindsight, this selection at random caused him to err in disallowing the write-offs by plaintiffs of the two largest accounts listed above, namely, Smith and King. On the other hand, he allowed some write-offs which, from his examination of the books, he should have known had been substantially recovered by plaintiffs.
Mrs. Ehlen based her write-off decisions on a specific analysis of doubtful accounts. She was aided in her decisions by Dun & Bradstreet reports, local plumbing association credit information, unsuccessful collection efforts, and in some instances by her knowledge of financial or other difficulties of individual customers. In her estimate of un-collectibility of the above-listed accounts, she was substantially correct that the Smith and King accounts should be written off, but the remaining 6 accounts were collected substantially in full, as were several of her write-offs which were not questioned by Agent Vogt.
10. The method used by plaintiffs in computing the addition to their bad debt reserve, as described in finding 6, supra, was consistent with generally accepted principles of accounting. As pointed out by defendant’s expert accounting witness, there are numerous accounting approaches to the computation of bad debt reserves, and plaintiffs’ approach was a proper one provided the percentage figure applied to charge sales was reasonable in the light of past experience. However, the agreement with Revenue Agent Harén in 1952 to use
*55 a reserve balance of $25,000 at December 31, 1951, and to maintain the future reserve 'balances at 2y2 percent of charge sales resulted in an overstated reserve which was not justified by plaintiffs’ bad debt experience. The increasing overstatement of the reserve which resulted from plaintiffs’ consistent application of the 1952 formula may be illustrated by the following table using figures from Appendix A, infra, and covering the years, 1953-1959, inclusive:

11. Plaintiffs were not unreasonable in their consistent application of the 1952 formula established by agreement with Revenue Agent Harén. Defendant’s expert accounting witness would have done the same thing had he been employed by plaintiffs as a certified public accountant to prepare their tax returns. However, from this record the fact remains that, by at least the time of the years in question, plaintiffs’ use of the 1952 formula had produced an overstated reserve. Therefore, it was not unreasonable for Agent Vogt to revise the 1952 formula, as he did, by applying to charge sales a moving average percentage computed from plaintiffs’ actual past bad debt experience during the taxable year and the preceding 4 years.
Accordingly, the Commissioner of Internal Revenue did not abuse his discretion in adopting Revenue Agent Vogt’s proposals and in disallowing plaintiffs’ 1955 bad debt deduction of $15,340.94, and in disallowing all but $163.31[9] of their 1956 bad debt deduction of $27,869.41.
*56 12. On September 12,1958, the Commissioner of Internal Revenue issued to plaintiffs a statutory notice of deficiency for both 1955 and 1956. As stated above, he adopted Revenue Agent Vogt’s proposals without change and asserted deficiencies of $12,734.59 for 1955 and $21,952.03 for 1956. Among the adjustments causing the deficiencies were the following:[10]
It has been determined that the bad debt deduction claimed, in the amount of $15,340.94 [for 1955], is overstated in the amount of $15,340.94. Exhibit A attached [which was Exhibit A to Revenue Agent Vogt’s report] shows the computation of this adjustment, and a reasonable addition to the bad debt reserve under 1954 Internal Revenue Code Section 166 and the formula set forth in the Black Motor Co., Inc. Case (41 BTA 300).
* * * * #
It has been determined that the bad debt deduction claimed in the amount of $27,869.41 [for 1956], is overstated in the amount of $27,706.10. See Exhibit A attached, and adjustment explanation (a) for the 1955 year [quoted above], for details and further explanation.
On December 12,1958, plaintiffs paid to the District Director of Internal Revenue, Phoenix, Arizona, the deficiencies so asserted in the total amount of $34,686.62. On January 2, 1959, plaintiffs paid said District Director the sum of $4,146.93, representing the interest determined to be due on said deficiencies.
On February 10, 1959, plaintiffs duly filed claims for refund of the additional income taxes, plus statutory interest, paid by them pursuant to the asserted deficiencies aforesaid. On June 23,1959, the claims were formally disallowed, and this suit was timely filed thereafter.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is dismissed.

*57

 Plaintiffs’ calculations for their 1955i and 1956 deductions are set forth in. tabular form in finding 6, infra.

 In Black Motor Co., Inc., 41 B.T.A. 300 (1940), the formula used was a ratio of net bad debts to accounts receivable for the 5-year period. How-ever, in the present case, Agent Vogt substituted charge sales for accounts receivable in the ratio as he considered this more in line with plaintiffs’ past practice. No issue has been raised by the plaintiffs in this respect, and Agent Vogt has testified that the use of charge sales instead of accounts receivable made little difference in this case.

 Agent Vogt’s calculations for 1955 and 1956 are set forth in tabular form in findings 7 and 8, infra.

 Since, in a case of this sort, each year must he judged on its particular facts, the prior allowance was not binding on the agent. See Art Metal Construction Co. v. United States, 84 Ct. Cl. 312, 32.9; 17 F. Supp. 854, 868 (1937).

 Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933) ; Paramount Finance Co. v. United States, supra; Maytag, Jr. v. United States, 153 Ct. Cl. 622, 626, 289 F. 2d 647, 650 (1961).

 Hindsight as to accounts actually collected in later years enables us to determine that the exact amount in the reserve was $6,003.50.

 The stated method may he placed in mathematical terms with reference to Appendix A, as Column 2, minus Column 3, plus Column 4, equals Column 7.

 In the Black Motor Co. formula, accounts receivable Instead of charge sales are used In computing this ratio. Revenue Agent Vogt used charge sales in computing the ratio because he thought the charge sales method' would more accurately earry forward what plaintiffs had already begun in setting up their reserve In previous years. For the purpose of his testimony In this case, Agent Vogt computed the formula using both charge sales and accounts receivable In arriving at the ratio, but the differences were not such as to change Ms result.

 Agent Vogt testified that be made an inadvertent mathematical error in his report which caused* him to allow the small bad debt deduction of $163.31 and that, but for this error, he would have allowed no deduction whatever for 1956. However, defendant has not sought here to correct any such error.

 In addition to the adjustments here involved, the deficiency notice made other minor adjustments to plaintiffs’ returns, none of which are in dispute herein.

 These figures represent plaintiffs' determinations prior to any adjustments by the revenue agent.