**BENEFICIAL CORPORATION and Subsidiaries, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 250–83T.**

United States Claims Court.

Nov. 4, 1985.

As Amended Nov. 13, 1985.

Herbert L. Awe, Washington, D.C., for plaintiff. Robert T. Carney and Jerome Fink, of counsel.

Theodore D. Peyser, Jr., Washington, D.C., with whom was Glenn L. Archer, Jr., and Donald H. Olson, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

This is a tax refund case which comes before this court under section 166(c) of the Internal Revenue Code of 1954 (hereinafter referred to as the Code) as codified in Title 26 of the United States Code. Plaintiff seeks a tax refund of federal income tax in the amounts of $21,137,455 and $8,559,114 for the taxable years 1976 and 1977, respectively. This case comes before us on defendant's Motion for Summary Judgment and plaintiff's Cross-Motion for Partial Summary Judgment. Jurisdiction is conferred upon the court pursuant to 28 U.S.C. § 1491. *See Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967).

## FACTS

Plaintiff, Beneficial Corporation, is an accrual basis taxpayer engaged in the consumer finance business and keeps its books on a calendar year basis. Pursuant to section 166(c) of the Code and the Income Tax Regulations thereunder, plaintiff elected and established the reserve method of accounting for bad debts.

On audit of plaintiff's returns filed for 1976 and 1977, the Commissioner of the Internal Revenue Service (hereinafter referred to as the Commissioner), found that plaintiff claimed additions to its reserve for bad debts exceeding those reasonably expected to be written off in the next succeeding year. The Service disallowed plaintiff's additions to its bad debt reserve, resulting in deficiencies of $16,037,089 and $4,641,296 for the years 1976 and 1977 respectively. Plaintiff paid the resulting deficiencies and on or about November 4, 1982, filed timely claims for refund pursuant to section 6511 of the Code. On December 8, 1982, plaintiff's claims for refund were disallowed by the Commissioner.

Plaintiff contends that the additions made to its bad debt reserve for the years 1976 and 1977 were reasonable and that the Commissioner abused his discretion by applying the *Black Motor* formula [1] to this set of facts. Plaintiff further contends that the Commissioner abused his discretion by imposing the *Black Motor* formula upon plaintiff while permitting plaintiff's competitors to take significantly larger deductions than what would be allowed under the traditional *Black Motor* formula.

## DISCUSSION

Section 166(a) [2] of the Code allows a deduction for bad debts which have become

---

**1.** In *Black Motor Co. v. Commissioner,* 41 B.T.A. 300 (1940), aff'd on other grounds, 125 F.2d 977 (6th Cir.1942), the Board of Tax Appeals (now the United States Tax Court) sanctioned what came to be known as the *Black Motor* formula of computing the deduction for each tax year, as follows: (1) Compute an average percentage based on bad debts for the current and five preceding tax years divided by the accounts and notes receivable outstanding; (2) multiply the percentage by the receivables outstanding at the end of the current tax year, thereby giving the "loss reserve;" (3) add the charges to the reserve

during the current tax year, thereby giving the "total reserve requirement"; and (4) subtract the balance in the reserve at the end of the preceding tax year. The resulting amount is the deductible addition to the bad debt reserve. *See generally* Whitman, Gilbert, and Picotte, *The Black Motor Bad Debt Formula: Why It Doesn't Work and How to Adjust it,* 35 J.Tax'n 366 (1971).

**2.** Section 166(a) reads, in pertinent part, as follows:

worthless during the taxable year. This provision of the Code provides two ways in which the deduction may be claimed: the specific charge-off method or the reserve method. Under the specific charge-off method, bad debts are deducted (either in full or in part) in the taxable year in which they become worthless. In lieu of a deduction from income for specific bad debts, an accrual basis taxpayer may establish a reserve for bad debts [3] and deduct "reasonable" additions to that reserve under section 166(c) [4] of the Code.

Generally, the reserve method is more advantageous than the specific charge-off method because it can accelerate the year of deduction for reasonably anticipated bad debts, permitting the taxpayer to defer taxes on the amount of income equal to his bad debt reserve. Additionally, it is a relatively simple way for handling large numbers of accounts. Once a taxpayer elects either the specific charge-off or reserve method, that election is binding for all subsequent years unless permission to change is received from the Commissioner.

### I.

Plaintiff contends that where the outstanding receivables have an average maturity substantially in excess of one year, the current reserve should be large enough to cover those receivables which are expected to be charged-off in later years as well as those receivables expected to be written off in the next succeeding year. Therefore, plaintiff contends that the Commissioner abused his discretion in limiting plaintiff's additions to its bad debt reserve to an amount which would cover only the actual charge-offs which reasonably could be expected to occur in the next succeeding year. In support of its position, plaintiff has directed the court's attention to several affidavits which suggest that it would be inappropriate for the Commissioner to apply the *Black Motor* formula [5] to a consumer finance business engaged in long term financing. Although the affidavits present an interesting argument from a financial accounting viewpoint, the court will not ignore the clear intent of Congress as revealed in the plain language of the statute and the holdings of this and other courts.

Prior to 1921, the revenue laws restricted taxpayers to the specific charge-off method. Under this method, a bad debt deduction was allowed only for debts ascertained to be worthless and charged-off within the taxable year. In the Revenue Act of 1921, later codified as section 166(c) of the Code, Congress authorized tax-payers to elect, in the alternative, to use the reserve method. It is clear from the language of the statute that a taxpayer has an absolute right to choose to deduct his worthless debts when they are ascertained to be worthless, but if, instead, he chooses to deduct additions to a reserve, he subjects himself to a reasonable and discretionary review of the additions to the reserve by the Commissioner.

Ordinarily, deductions based upon reserves are not allowed under the revenue laws and this was true originally as to bad debts. Section 166(c) of the Code repre-

---

(a) General rule
  (1) Wholly worthless debts
  There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
  (2) Partially worthless debts
  When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

**3.** Typically, an account entitled "Bad Debt Reserve" appears on the taxpayer's books, as well as on the tax return, as an offset to accounts or notes receivable. Additions to the reserve are made by making a debit to expense and credit to the reserve account. When a debt becomes worthless, the reserve account is debited and the applicable asset account is credited.

**4.** Section 166(c) reads, in pertinent part, as follows:
  (c) Reserve for bad debts
  In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts.

**5.** For a discussion of the *Black Motor* formula, see footnote 1.

sents an exception to the general rule; it allows a deduction (in the discretion of the Commissioner) for a reasonable addition to a reserve for bad debts. It is clear that Congress was unwilling to give the taxpayer an absolute right to such a deduction and explicitly made it contingent upon the Commissioner's discretion. When Congress so far departs from the customary practice as to permit such a deduction as to a bad debt reserve, the condition is as important as the permission. *Krim-Ko Corp. v. Commissioner,* 16 T.C. 31, 37 (1951). Generally, the Commissioner's determination of deficiency carries a presumption of correctness. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). However, the Commissioner's determination of what constitutes a reasonable addition to a bad debt reserve carries more than the usual presumption of correctness because of the discretion expressly vested in him by section 166(c). *Mills & Lupton Supply Co. v. Commissioner,* 36 T.C.M. 1173, 1174 (1977).

◼ Plaintiff contends that the additions determined by its method were reasonable and that its position is supported by its officers and by several affidavits from distinguished persons in the field of accounting. However, it appears that plaintiff does not fully comprehend the latitude provided the Commissioner by the express statutory grant of discretion in section 166(c). It is not enough for plaintiff to prove that its method of computing its bad debt reserve was reasonable. It does not necessarily follow that merely because the method used by the taxpayer was reasonable that the determination made by the Commissioner was, therefore, unreasonable. The courts have uniformly held that the Commissioner's determination of a "reasonable" addition must be sustained unless the taxpayer proves that the Commissioner abused his discretion. The taxpayer bears a heavy burden in this respect. *Paramount Finance Co. v. United States,* 157 Ct.Cl. 824, 304 F.2d 460 (1962); *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979).

Mindful of the distinct and very heavy burden of proof which the plaintiff must meet on the bad debt reserve issue, the court must consider whether the Commissioner has abused his discretion. Section 1.166–4(b)(1) (1959) of the Treasury Regulations provides in pertinent part:

What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.

The most commonly recognized method of determining a reasonable addition to a bad debt reserve is known as the *Black Motor* formula. This method takes a taxpayer's own experience with bad debts in prior years and, from that, establishes a percentage of outstanding receivables which can be expected to be charged-off in the next succeeding year.

Throughout the more than forty years since its establishment, there have been many court cases involving *Black Motor* computations. The courts have both approved its use by sustaining the Commissioner's computation and distinguished its use by allowing other methods of computing additions to the reserve. In *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), the Supreme Court supported the formula by stating that "after its 40 years of near-universal acceptance, we are not inclined to disturb the *Black Motor* formula now." *Id.* at 549, 99 S.Ct. at 789. Additionally, the Court noted that since the judicial approval of the *Black Motor* formula in 1940 it has been "employed consistently by the Commissioner, approved by the courts, and collaterally recognized by the Congress." *Id.* at 548, 99 S.Ct. at 789.

The contention principally relied on by the plaintiff is that the Commissioner used a rigid mathematical formula in determining the amount of additions to the reserve and that a determination reached by such a method is contrary to the provisions of the statute and of the regulations. We grant that a slavish adherence to a formula might, under certain conditions, result in an unreasonably small addition to a bad debt reserve, but such is not the case here.

The focal point of inquiry is whether the "reasonable addition" language of section 166(c) contemplates an addition, and a corresponding deduction, for debts which may become worthless in future years. There is no dispute between the parties in this action that the Code contemplates and that Congress intended to allow taxpayers a deduction for bad debts which are expected to become worthless in the next succeeding year. The question is whether the Code contemplates a deduction for debts that may become worthless in more than one future subsequent year depending upon the long-term nature of the particular debts involved. Furthermore, there is no dispute that the "reasonable addition" computation should involve a fraction or factor which is then multiplied by the year-end receivables, or in this case the year-end outstanding loans owing to the plaintiff. The question is what fraction or factor should be used in this mathematical computation.

Plaintiff contends that the multiplication factor should be 4.7856% and 5.1737% for the years 1976 and 1977, respectively. An analysis of these factors will give a clear understanding of plaintiff's argument. For example, the 5.1737% factor for 1977 is the estimated percentage of plaintiff's year-end loans that will become uncollectible in the next five years. The majority of plaintiff's loan portfolio consists of loans with a five-year maturity date. Therefore, plaintiff has determined from past experience that it can expect that in 1978 and in each of the next five years a percentage of these loans will become uncollectible. These percentages for each of the succeeding years, as revealed in the affidavit of

Mr. Theodore D. Peyser, counsel for defendant, are as follows:

| YEAR | PERCENTAGE |
|------|------------|
| 1978 | 2.3221% |
| 1979 | 1.5676% |
| 1980 | .7596% |
| 1981 | .3279% |
| 1982 | .1359% |
| 1983 | .0606% |
| TOTAL | 5.1737% |

Plaintiff then computes its year-end "reasonable addition" to its bad debt reserve by first multiplying its $2,103,396,608 1977 year-end outstanding loans by this 5.1737% factor to arrive at its current 1977 year-end reserve of $108,823,430.

Defendant contends that the proper focus for determining plaintiff's "reasonable addition" and its corresponding deduction is limited to those loans which are estimated to become worthless in the year 1978, and not all debts estimated to become worthless in the years 1978 through 1983. Therefore, defendant contends that the proper factor to be used in determining the 1977 "reasonable addition" to plaintiff's bad debt reserve and its corresponding deduction is 2.2322%. This represents the percent of plaintiff's 1977 year-end outstanding loans that will become worthless in 1978. Thus, defendant would allow the plaintiff a reserve at the end of 1977 of $46,952,019, which is arrived at by multiplying the loans outstanding at the 1977 year-end, $2,103,396,608, by 2.2322%. Defendant contends that the current 1977 year-end reserve computed by plaintiff goes far beyond what was contemplated by Congress in its enactment of section 166(c). Furthermore, defendant contends that it greatly accelerates plaintiff's deductibility of uncollectible loans which are not expected to actually become uncollectible for several years in the future, thus causing a severe distortion of its income and a corresponding reduction in its 1977 tax liability. The court agrees with defendant.

Plaintiff does not claim that the reserve for bad debts as determined by the defendant was not sufficient to cover actual charge-offs for the year ending December

31, 1977, or for the previous year. Moreover, even if plaintiff should sustain bad debt losses in a later year in excess of what can be absorbed by the reserve, it would not necessarily be disadvantaged thereby, for such excess would be taken into account in determining the addition to the reserve in the later year.[6] Thus, plaintiff, would not be hurt thereby because it would have the advantage of a deduction for such losses in the year in which they in fact occur, similar to the specific charge-off method. Furthermore, if the losses for any given year should result in a net operating loss for that year, such loss may be carried backward or forward under the provisions of section 172 of the Code.[7] Plaintiff in effect argues that the function of a reserve for bad debts is to protect it against excessive losses in future years.

In support of its contention, plaintiff cites *Brown v. Helvering,* 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1934), for the proposition that the concept of a bad debt reserve is an instance where tax and financial accounting principles are the same. In *Brown v. Helvering,* the taxpayer was the general agent of several fire insurance companies and received certain commissions on the policies written each year. However, the taxpayer was liable to the companies for a part of the commissions previously received if any of the policies were cancelled by the policy holders in subsequent years. In his book accounts and income tax return, the taxpayer deducted from the accrued commissions of each year a sum entered in a reserve account to represent that part of the commissions which, according to the experience of earlier years, he would eventually owe to the insurance companies because of policy cancellations. In holding that the additions to the taxpayers reserve were not deductible, the Supreme Court noted that only a few reserves voluntarily established by prudent businessmen as a matter of conservative accounting practice are authorized by the Revenue Laws.

At that time, the Court was bound by the Internal Revenue Code of 1939 which provided that the only relevant deductions allowable by the Revenue laws were those provided in section 214 of the Code. The burden was on the taxpayer to show that he was entitled to the deduction claimed. Section 214 of the 1939 Code mentioned only the reserve for bad debts (in the discretion of the Commissioner); those for depreciation and depletion; and the special provisions concerning future expenses in connection with casual sales of real property of section 214 as amended by the Revenue Act of 1926. *Id.* at 202, 54 S.Ct. at 360. It is from this discussion of section 214 from the *Brown* opinion that plaintiff in the instant case makes the conclusion that the concept of a bad debt reserve is an instance where tax and financial accounting principles are the same.

The court agrees that the concept of a bad debt reserve has been a part of the financial accounting world for decades and that section 166(c) of the Code permits the use of a bad debt reserve for tax accounting purposes. However, this is not to say that the method of computing a reasonable addition to a bad debt reserve will be identical from a tax accounting viewpoint as it is from the perspective of a businessman in the financial accounting context. Indeed, there are various considerations that may properly influence a businessman to estab-

---

6. Treasury Regulation section 1.166–4(b)(2) reads, in pertinent part, as follows:

In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year.

7. Section 172 of the Code reads, in pertinent part, as follows:

  (a) Deduction allowed

  There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection.

lish a reserve for bad debts which may arise in the future, and there are, of course, numerous accounting methods by which this may be accomplished. However, from the standpoint of obtaining the tax deduction, it cannot be overlooked that the applicable statute places the reasonableness of the addition to a bad debt reserve within the "discretion of the Secretary."

Plaintiff cites *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979) and *Nash v. United States*, 398 U.S. 1, 90 S.Ct. 1550, 26 L.Ed.2d 1 (1970) for the proposition that all losses to be sustained in subsequent years should be considered when computing what constitutes a reasonable addition to a bad debt reserve. However, when put in their proper context, these cases will not bear the weight plaintiff seeks to place on them.

In *Thor Power* the taxpayer was a corporation engaged in the business of manufacturing and selling hand-held power tools, parts, and accessories for household and industrial use. Several of these hand-held tools and other accessories were sold on account creating an accounts receivable balance on the taxpayer's books. In affirming the actions of the Commissioner, the Court noted that "[a] 'reasonable' addition is the amount necessary to bring the reserve balance up to the level that can be expected to cover losses properly anticipated on debts outstanding at the end of the tax year." *Id.* 439 U.S. at 546, 99 S.Ct. at 788. Plaintiff in the instant case contends that this statement supports its position. However, the accounts receivable involved in *Thor Power* were short term in nature. Therefore, the Supreme Court was not confronted with the issue presently before this court. Furthermore, by supporting the Commissioner's determination of deficiency, it is clear that *Thor Power* solidly supports the *Black Motor* formula and stands for the proposition that the Commissioner's determination of a reasonable addition "must be sustained unless the taxpayer proves that the Commissioner abused his discretion." *Id.* at 547–48, 99 S.Ct. at 789.

In *Nash*, a partnership transferred its accounts receivable to a newly-formed corporation in exchange for the corporation's stock. The transfer was within the terms of section 351 of the Code, which provides that no gain or loss shall be recognized if property is transferred to a corporation in exchange for stock, if after the exchange the transferors are in control of the corporation. In an attempt to explain what constitutes a bad debt reserve the court noted:

> Under the reserve method of accounting a taxpayer includes in his income *the full face amount of a receivable on its creation* and adjusts at the end of each taxable year the reserve account so that it equals that portion of current accounts receivable that is estimated to become worthless in *subsequent years*. (Emphasis added.)

*Id.* 398 U.S. at 2, 90 S.Ct. at 1550.

Plaintiff argues that the use of the words "subsequent years" supports its contention that it should be permitted to include in its "reasonable addition" to its 1977 bad debt reserve all the anticipated uncollectible loans for the years 1978 through 1983. However, plaintiff's reliance upon *Nash* is unfounded. The Supreme Court in *Nash* does not deal with the issue involved in the instant case. The court's discussion of section 166 was merely explanatory in nature and was not, as far as this court can tell, intended in any way to be a dispositive statement of the law on the issue presented in the instant case. In fact, the court made no mention as to what constitutes a reasonable addition to a bad debt reserve. Furthermore, the Court in *Nash* explicitly assumes that the reserve-method taxpayer would include in its income "the full face amount of a receivable on its creation." *Id.* at 2, 90 S.Ct. at 1550. However, plaintiff in the instant case failed to convince the court that it did this. Thus, whatever validity this statement from the *Nash* opinion may have, it has no application to the taxpayer in the instant case.

In an attempt to further bolster its position, plaintiff cites *Merchants Industrial*

*Bank v. Commissioner,* 475 F.2d 1063 (10th Cir.1973), wherein the Tenth Circuit noted the "subsequent years" language in *Nash* and stated "[t]he use of the plural rejects the concept that the adjustment takes into consideration only the next taxable year." *Id.* at 1065. Plaintiff contends that this statement in *Merchants* causes defendant's "next year" focus to fail. However, *Merchants* involved special bad debt reserve rules made applicable only to banks under Revenue Ruling 65–92, 1965–1 C.B. 112. Plaintiff acquires no support from the Tenth Circuit's comment in *Merchants.*

Finally, plaintiff relies on *Thompson v. Commissioner,* 761 F.2d 259 (6th Cir.1985). In *Thompson,* the taxpayer was a corporation that dealt in heavy construction equipment. In the years 1974 to 1976, the taxpayer found that its sales on account were dropping, but that its accounts receivable balance at year end was rising. Thus, in 1976, the taxpayer abandoned its use of the *Black Motor* formula and sought to compute its bad debt reserve through a specific analysis of doubtful accounts. The Commissioner disallowed the charge and recomputed the reserve using the *Black Motor* formula.

The Sixth Circuit noted the decision of *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), wherein the Supreme Court found the *Black Motor* formula to be presumptively reasonable. *Id.* at 549, 99 S.Ct. at

789. However, the court concluded that the taxpayer in *Thompson* had successfully rebutted this presumption. This court agrees that there will be cases when adherence to the *Black Motor* formula will generate an arbitrary result. Indeed, the Commissioner has acknowledged that there are such cases. (See Rev.Rul. 96–362, 1976–2 C.B. 45, 46). However, the court does not agree with plaintiff that *Thompson* should be the guiding light for the instant case.

■ *Thompson* involved a taxpayer whose year-end receivables changed drastically. Its yearly sales were decreasing (from $29,823,071 in 1974 to $27,354,968 in 1976) and yet its year-end accounts receivable were increasing (from $2,324,011 in 1974 to $8,240,444 in 1976). Thus, the facts in *Thompson* involved a situation where the taxpayer's average loss experience from accounts receivable failed to adequately reflect actual losses. In the instant case, however, plaintiff had no unusual loss experience with which to rebut the application of the *Black Motor* formula. In fact, the taxpayer does not claim that the reserve for bad debts as determined by the defendant was not sufficient to cover actual charge-offs for the years 1976 and 1977. In addition, the following analysis of the schedules found in the Peyser Affidavit reveals that the bad debt reserve allowed the taxpayer under the *Black Motor* formula was adequate to cover actual charge-offs in each of the years in issue.

| YEAR | OPENING RESERVE | ACTUAL NET CHARGE–OFFS |
|---|---|---|
| 1976 | $62,250,383 | $37,616,898 |
| 1977 | 39,393,546 | 39,256,658 |

Although section 1.166–4(b)(1) of the Treasury Regulations directs inquiry into the reasonableness of a bad debt reserve to the facts known at the close of the taxable year in question, subsequent loss experience may properly be considered as additional evidence tending to confirm the reasonableness of the additions to the reserve. *James A. Messer Co. v. Commissioner,* 57 T.C. 848, 865 (1972); *Mill Factors Corp. v.*

*Commissioner,* 14 T.C. 1366, 1375 (1950). Plaintiff's subsequent loss experience confirms the reasonableness of the Commissioner's application of the *Black Motor* formula and supports the conclusion that he did not abuse his discretion in the instant case.

The defendant has cited a plethora of case law supporting the "next year" focus

and repudiating plaintiff's "future years" focus. Some involve receivables which are repayable over a period of substantially more than one year.

One of the first decisions to adopt the *Black Motor* formula by name involved a consumer finance company. *S.W. Coe & Co. v. Dallman*, 216 F.2d 566 (7th Cir. 1954). The use of that method with its "next year" focus was approved by the Seventh Circuit in the face of the taxpayer's concern with its "future years" focus. The court in *Dallman* recognized that the fear of adverse loss experience in future years might warrant appropriate protective action by management, but it held that such fear does not support an additional bad debt deduction. This analysis was equally conveyed in the Court of Claims opinion of *Paramount Finance Co. v. United States*, 157 Ct.Cl. 824, 304 F.2d 460 (1962) and the Tax Court opinion of *Massachusetts Business Development Corp. v. Commissioner*, 52 T.C. 946, 952 (1969). In *Paramount*, the bad debt reserve was limited to the next year charge-offs and was deemed reasonable under *Black Motor*. Significantly, *Paramount* was given great weight by the Court of Claims in *Ehlen v. United States*, 163 Ct.Cl. 35, 323 F.2d 535 (1963), when the court considered the *Black Motor* formula at length and found the Commissioner's use of that method to constitute a reasonable exercise of his discretion. In addition, the decision in *Ehlen* is twice cited with approval in *Thor Power Tool. See also Valmont Industries, Inc. v. Commissioner*, 73 T.C. 1059, 1068–69 (1980).

In *Investors Discount Corp. v. Commissioner*, 48 T.C. 767 (1967), the taxpayer acquired debt instruments calling for repayment over a period of ten to twenty years. Fearing later year difficulties, the taxpayer claimed additions to its bad debt reserve greater than the Commissioner deemed reasonably justified by its current charge-off experience. The Tax Court sustained the Commissioner's action, stating:

> The essential question to be determined in establishing an addition to a bad debt reserve is whether, looking at the factual situation as it exists at the end of the taxable year, the reserve is sufficient to absorb the bad debts that are anticipated during the subsequent taxable year. The fact that feared contingencies may arise in a later period, although possibly justifying an accumulation of surplus from the viewpoint of sound business management, does not justify the type of reserve contemplated by section 166. Indeed, the manner in which the amount of the deduction is calculated reveals that the anticipated losses for the following year is the focal point of inquiry. The amount in the reserve is reexamined annually in order to determine the amount of the addition required. (Citations omitted.)

*Id.* at 771.

■ After carefully considering the facts of this case, the court is convinced that the taxpayer has not sustained its heavy burden of showing that the Commissioner abused his statutory grant of discretion. Furthermore, the court is in agreement with those cases cited by defendant which hold that the *Black Motor* formula may be applied to taxpayers, similar to plaintiff, who engage in long-term financing. Moreover, the court agrees that the anticipated losses for the next succeeding year is the focal point of inquiry. The court would do violence to the plain meaning of the statute and restrict a clear legislative attempt to bring the taxing power to bear upon plaintiff's income were it to conclude otherwise.

## II.

Plaintiff also contends that the Commissioner abused his discretion by imposing the *Black Motor* formula upon plaintiff while permitting its competitors to take significantly larger deductions than what would be allowed under the traditional *Black Motor* formula. Although plaintiff made mention of this in its opening and reply briefs, it made no attempt to show the court that there was any validity to the claim. In fact, plaintiff refused to identify

its "competitors" who were permitted to take larger deductions. By failing to come forward during the course of this litigation with even a scintilla of evidence in support of the claim, the court is forced to conclude that the claim is totally without merit.

We have carefully considered plaintiff's remaining allegations and find them to be without merit.

## CONCLUSION

The court accordingly grants Defendant's Motion for Summary Judgment and denies Plaintiff's Cross-Motion for Partial Summary Judgment. The clerk is directed to dismiss the Complaint.