The PARAMOUNT FINANCE
COMPANY
v.
The UNITED STATES.

Edward T. KIRTZ and Rosalyn S. Kirtz
v.
The UNITED STATES.

Nos. 2-59, 3-59.

United States Court of Claims.

June 6, 1962.

-- Harlan Pomeroy, Washington, D. C., for plaintiffs. Norman A. Sugarman, Cleveland, Ohio, on the briefs.

S. Laurence Shaiman, Washington, D. C., with whom was Acting Asst. Atty. Gen., John B. Jones, Jr., for defendant. Lyle M. Turner, Philip R. Miller, and Eugene Emerson, Washington, D. C., on the brief.

LARAMORE, Judge.

This suit arises from the determination of a deficiency in plaintiffs' income taxes assessed and collected by the Internal Revenue Service. The plaintiffs in this action are Edward T. Kirtz and Rosalyn S. Kirtz (hereinafter referred to as Kirtz), and the Paramount Finance Company (hereinafter referred to as Paramount).

At all times material Kirtz was an insurance agent duly licensed by the Ohio Superintendent of Insurance and engaged in the business of writing life insurance. Kirtz and his wife filed a timely joint Federal income tax return on the cash basis for the calendar year 1955, the year involved in their petition.

Max Feldman, Arthur L. Feldman, and Herbert I. Baker, are the principal officers of Paramount, and at all times pertinent herein they were in control of management and were the majority stockholders therein. For conciseness and ease of comprehension these officers will hereinafter be referred to simply as the Feldmans.

In 1951, the Feldmans first discussed the possibilities of making arrangements to refer insurance business to insurance companies. They contacted a representative of the Credit Life Insurance Company of Springfield, Ohio, and an oral agreement was accomplished along lines suggested by the insurance company, which required that such insurance be written through a licensed insurance agent in order to comply with Ohio law. The Feldmans were given the privilege of selecting the agent through whom insurance would be written. They selected Kirtz, a personal friend of Arthur L. Feldman, who agreed to become the licensed agent in this arrangement. The insurance company sent the necessary papers to the Feldmans for having Kirtz designated as an agent of the insurance company, the Feldmans had Kirtz sign them, then they sent the papers back to the insurance company.

After Kirtz became the insurance agent for their operations, the Feldmans proceeded to contact automobile dealers and other types of retail and installment-sale dealers and point out the advantages of having available credit life, health, and accident insurance for their customers. These activities tied in with their operations conducted for Paramount since, during the years in question, Paramount did discount business with at least 150 automobile dealers.

The Feldmans actively engaged in handling the details of their arrangements with the Credit Life Insurance Company, seeking to persuade the dealers that it was to their advantage as well as that of their customers to have credit life insurance coverage. This activity on the part of the Feldmans was solely with the dealers and was not done directly with the customers, nor at the Paramount offices. It is impossible to determine precisely what amount of time the Feldmans spent on insurance business since such activities were correlated with their contacts with dealers for promotion of the finance business of Paramount.

Pursuant to the agreements between the Feldmans and the Credit Life Insurance Company, and between the Feldmans and Kirtz, the amounts received in the years 1954 and 1955 by the Feldmans from Kirtz were for the promotion of insurance and the referral of insurance business.

In making payment for these policies to the Credit Life Insurance Company, a monthly check for the total of all premiums that month was drawn on the account of Paramount payable to Kirtz. These premiums were derived from the financial paper purchased by Paramount from dealers. This check, together with a summary of policies written during the month, was delivered personally to Kirtz by Arthur Feldman. Kirtz deposited the check in a special account entitled "Edward Kirtz, Special Account." Kirtz then forwarded a check issued on such account to Credit Life Insurance Company for 60 percent of the premiums, retaining 40 percent. In accordance with his previous agreement with the Feldmans, he retained 5 percent of the premiums and returned 35 percent of the premiums to the Feldmans.

The amount received by Kirtz in 1955, representing 5 percent of the premiums, was reported by him as taxable income, but he did not report as taxable income the 35 percent of the premiums which were paid to the Feldmans.

The amounts paid to the Feldmans for the referral of insurance business were

not received or controlled by Paramount, and were not treated by it as its income. The amounts received by the Feldmans were treated as income by them and reported on their tax returns for 1954 and 1955.

The arrangements between Paramount, the Feldmans, and Credit Life Insurance Company were made known to the Ohio Superintendent of Insurance in the course of an investigation requested by the Internal Revenue Service to the Insurance Department. The Department of Insurance did not advise any of the parties to stop or alter in any way the arrangements. In fact, payments such as those made herein to the Feldmans have been made by other insurance agents in connection with other finance companies. Such payments have been a practice in the Cleveland area for many years.

Simply stated, we have a situation where a customer pays a premium for insurance, let us say, in the amount of $100. He pays the full amount to Paramount, which in turn performs the necessary paperwork. Paramount then forwards the full $100 to Kirtz, who in turn sends $60 to the insurance company. There is no dispute at this point. Kirtz, however, sends $35 to the Feldmans. The Government contends that this payment to the Feldmans is in violation of Ohio law, thus no deduction should be permitted Kirtz. Further, the Government contends that this payment should be treated as if it were constructively received by Paramount, should be included in its gross income, and that no deduction be permitted Paramount because there is nothing to indicate that Paramount regarded the payment to the Feldmans as necessary expenses of the corporation. Thus, the Government has collected income tax on the same $35 from the Feldmans, Paramount, and Kirtz.

The plaintiffs first contend that receipt of this payment should not be included in their gross income. They allege that they were mere conduits through whom the money passed and that they held the money with no "claim of right." Second, plaintiffs contend that if receipt of the payment is includable in gross income, it is a deductible trade or business expense.

■ As to Paramount, the facts reveal that it never received payment from Kirtz. We think it is quite unreasonable to attribute to the corporation receipt of income which it never realized, then deny a deduction for an amount equal to the sum of a payment made to several of its officers. Conceivably there may be instances where receipt of income by an officer of a corporation is tantamount to receipt of income by the corporation. In our view, if the income should be attributable to the corporation for reasons owing to the fact that corporate officers were actually performing services for the corporation, then this amount should be deductible under applicable Code provisions.[1] Since the result is identical whether the amount involved is includable in gross income then deducted or not included in gross income, we conclude it is moot as to the method employed.

As to Kirtz, he actually received payment from Paramount and it should properly be included in his gross income. If Kirtz is to be entitled to a tax benefit with respect to the amounts paid the Feldmans, such benefit must be in the form of a deduction from gross income.

The Government does not contend that the payment to the Feldmans by Kirtz was not an ordinary and necessary expense. Indeed, it could not because the facts show that Kirtz would not have been involved at all had he not consented to make payments to the Feldmans. However, the Government alleges that these

1. "§ 162. Trade or business expenses
"(a) *In general.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

"(1) a reasonable allowance for salaries or other compensation for personal services actually rendered." 26 U.S.C. (I.R.C.1954) § 162 (1958 Ed.)

payments were in violation of Ohio law and to permit a deduction would thwart a well-defined public policy. In support of its position the defendant cites several cases which hold a finding of "necessity" cannot be made if the allowance of the deduction would frustrate sharply defined national or state policies proscribing particular types of conduct, evidenced by some governmental declaration thereof. Tank Truck Rentals, Inc. v. Commissioner, 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562; Hoover Motor Express Co., Inc. v. United States, 356 U.S. 38, 78 S.Ct. 511, 2 L.Ed.2d 568; Commissioner v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171.

In Tank Truck Rentals v. Commissioner, 356 U.S. at page 35, 78 S.Ct. at page 510, supra, the court stated:

"Certainly the frustration of state policy is most complete and direct when the expenditure for which deduction is sought is itself prohibited by statute. See Boyle, Flagg & Seaman, Inc., v. Commissioner, 25 T.C. 43."

The Boyle, Flagg & Seaman case, cited with approval by the Supreme Court above, bears a strong similarity to the facts in the instant case. There, the Tax Court held that payments made by an insurance agency to automobile dealers for insurance solicitation in violation of Illinois law were non-deductible expenses.

▪ The Boyle case, and every case relied on by the defendant, contained an element lacking in the present action; i. e., a determination by the authority charged with the enforcement of the state or federal law or the carrying out of the public policy involved that the expense for the deduction sought was incurred in violation of that law or well-defined public policy. Lacking any such determination, we are of the opinion that an allega-

tion by the Internal Revenue Service that the expense was incurred in violation of a state statute is insufficient to disallow an otherwise proper deduction unless the expense occasioned an act *malum in se*. To permit the Internal Revenue Service to employ Federal tax law in an effort to enforce its concept of state law as the Service views it would be an unnecessary extension of its delegated authority, at the very best, and creates a disruptive atmosphere of interference by the Federal Government in an area traditionally reserved to the states. Inasmuch as the Ohio Superintendent of Insurance was apprised of the activities herein discussed and did not determine that a well-defined public policy was being violated, we are of the opinion that neither the Internal Revenue Service nor this court should provide that determination. For these reasons, the plaintiff Kirtz should be granted the deduction he seeks.

There remains one other issue for our consideration which we have not previously mentioned. In reporting its income for the years 1954 and 1955, Paramount used the reserve method for determining its deductions for bad debts. In lieu of deducting bad debt losses in the year the debt became wholly or partially worthless, under section 166(a) of the Internal Revenue Code of 1954,[2] the taxpayer, pursuant to section 166(c) of the Code, used the reserve method for determining its deductions for bad debts.

▪ In determining a reasonable addition to its reserve for bad debts for 1954, Paramount applied to its year-end balance of accounts receivable for 1954 the average ratio for the preceding 18 years of the amount of its annual net charge-off for bad debts to its annual year-end outstanding accounts receivable. Likewise, for the year 1955, it applied to its year-end balance of accounts receivable for 1955 the average ratio for the pre-

2. "§ 166. Bad debts
   "(a) General rule.—
   "(1) Wholly worthless debts.—
   "There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

   "(2) Partially worthless debts.—
   "When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

ceding 19 years. This was the method agreed upon in 1949 between Paramount and the Internal Revenue Service. The starting point used for bad debts was 1937 because, due to Paramount's size prior to that time, the early loss figures were not considered representative. Under this method, when 20 years' representative experience became available, the oldest year's experience was to be dropped and the latest year's experience added, so as to use a 20-year moving average based upon the latest 20 years' experience. In examining Paramount's tax returns for 1954 and 1955, the Internal Revenue agent redetermined the taxpayer's reserve for bad debts by limiting the loss ratio applied to year-end receivables to that for the current year and the preceding five years. The taxpayer alleges that this redetermination was an arbitrary abuse of discretion. While we recognize that the Internal Revenue Service agreed to a method in 1949 for administrative convenience to both taxpayer and the Service, we do not believe that the Service is thereby forever bound by such agreement. It is not unreasonable for the Commissioner of Internal Revenue to reappraise former administrative determinations in the light of new circumstances and facts.

Section 166(c) of the Internal Revenue Code of 1954 provides:

"In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts." 26 U.S.C. (I.R.C.1954) § 166 (1958 Ed.).

■■ Since by the terms of the statute the taxpayer is allowed to deduct its actual bad debts as a matter of right, but an addition to a reserve for estimated bad debts "in the discretion of the Secretary or his delegate" the issue is whether the exercise of discretion by the Commissioner of Internal Revenue was reasonable. Certainly the plaintiff has shown that the method it used in determining the amount to be added to its bad debt reserve was reasonable, but this is irrelevant. It does not follow that if the plaintiff was reasonable in its determination the defendant was unreasonable. The burden is on the plaintiff to show that the Commissioner was unreasonable, and absent this showing we will not assume that there has been an abuse of discretion. The taxpayer does not claim that the reserve for bad debts as determined by the Commissioner was insufficient to cover actual bad debt losses for the years involved. In fact, the opposite is true, the allowance determined by the Commissioner more than covered the actual losses. Although the method of computation employed by the Commissioner differed from that method formerly used and directed to be used by him, the determination of what constitutes a reasonable allowance shall be determined in the light of the facts existing at the close of the taxable year. From the standpoint of the plaintiff, it may be a sound management decision to accumulate surplus funds against future contingencies, but this does not mean that an adjustment of this accumulation by the Commissioner is unreasonable. We are convinced that the determination by the Commissioner was reasonable and not an abuse of discretionary powers.

For the reasons stated in this opinion, and pursuant to an agreement between the parties, judgment will be entered in favor of plaintiff Kirtz in the amount of $9,209.84, together with interest thereon as provided by law.

To the extent consistent with this opinion, judgment will be entered for plaintiff Paramount with the amount of recovery to be determined pursuant to Rule 38(c) of the Rules of this court, 28 U.S.C.

It is so ordered.

JONES, Chief Judge, and DURFEE, and WHITAKER, Judges, concur.

DAVIS, Judge, took no part in the consideration or decision of this case.