UNION NATIONAL BANK OF YOUNGSTOWN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 35495.

United States District Court
N. D. Ohio, E. D.

Jan. 8, 1965.

John H. Ranz and Donald J. Libert, of Manchester, Bennett, Powers & Ullman, Youngstown, Ohio, for plaintiff.

Louis Oberdorfer, Asst. Atty. Gen. and Robert Sama, Atty., Dept. of Justice, Washington, D. C., and Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, for defendant.

BATTISTI, District Judge.

This action is brought by the Union National Bank of Youngstown, Plaintiff, for the recovery of federal income tax deficiencies resulting from the Commissioner of Internal Revenue's disallowance of deductions for additions to the Bank's bad debt reserve for the calendar years 1954, 1955, and 1956. Jurisdiction is conferred by 28 U.S.C.A. § 1346(a) (1).

Plaintiff Bank paid the amounts of tax shown to be due on each of its federal income tax returns for the years 1954, 1955, and 1956 within the time allowed by law. Subsequently, the Commissioner caused an audit to be made of Plaintiff's return for those years. The Examining Agent made a finding disallowing the deductions claimed for the additions to Plaintiff's reserve for bad debts. This resulted in a proposed tax deficiency in the amount of $157,209.72 for all three years.

Thereafter, the Plaintiff Bank filed protest against the proposed deficiencies. The protest was partially allowed for the year 1956, but no change was made in the deficiencies found for the years 1954 and 1955.

On November 13, 1958, Plaintiff paid under protest to the District Director of Internal Revenue at Cleveland, Ohio, the following amounts:

| Year | Principal | Interest |
|------|-----------|----------|
| 1954 | $ 15,398.11 | $ 3,384.00 |
| 1955 | 30,822.73 | 4,924.46 |
| 1956 | 82,839.48 | 8,264.66 |
| Total | $129,060.32 | $16,573.12 |

On February 24, 1959, Plaintiff claimed a refund for the years in question, which was refused. On July 23, 1959, Plaintiff Bank filed this action.

Basically, the Plaintiff Bank proceeds on the theory that the Internal Revenue Service has employed a "strict and literal" interpretation of its own mimeograph and subsequent rulings which arbitrarily discriminates against the Plaintiff. The mimeograph and subsequent rulings, discussed infra, set forth the methods for computing additions to the reserve for bad debts.

## 1. *History of Plaintiff*

The Plaintiff Bank (sometimes hereinafter referred to as the "New Bank") began doing business as a national banking institution on January 4, 1932. Prior to this time, the national banks in Youngstown which experienced severe economic crisis were known to be financially insecure, particularly the First National Bank of Youngstown and the Commercial National Bank of Youngstown (sometimes hereinafter referred to as the "Old Banks").

In order to minimize losses to shareholders and creditors of the Old Banks, the Plaintiff New Bank was organized pursuant to a plan whereby it would (1) act as liquidating agent for the Old Banks; (2) enter into separate agreements with each of the Old Banks providing for the assumption of substantially all of their indebtedness and financial accounts of record on January 1, 1932, excluding, however, the liabilities of the Old Banks to their shareholders; and (3) assume certain other liabilities not shown on the books and records of the Old Banks which might be asserted in the future, but only to the extent that the Plaintiff New Bank elected to pay and discharge such liabilities.

Pursuant to these agreements, each of the Old Banks executed a note to the New Bank in the amount of the deposit and other liabilities assumed, and each assigned substantially all of its assets to the New Bank as security for the notes. The Plaintiff New Bank, as liquidating agent for the Old Banks, was authorized to credit the proceeds received from the liquidating of the Old Banks' assets against the indebtedness of each to the New Bank. Plaintiff was also authorized to select, as its own accounts, any of the assets, including loans, of the Old Banks and to credit the value thereof to their indebtedness. The notes were finally paid off and removed from the books of Plaintiff in 1942, and the Old Banks were liquidated sometime thereafter. These notes, discussed infra, (hereinafter sometimes referred to as "interbank loans") are the subject matter of Plaintiff's second cause of action.

The New Bank located its main office in the First National Bank Building. All of the employees of the New Bank, with the exception of the president, were selected from the former employees of the Old Banks. (The former presidents of the Old Banks became vice-presidents of the New Bank.) Some of the directors of the Old Banks became directors of the New Bank. The depositors and customers were substantially the same. The shareholders were not identical, but those of the Old Banks were given an opportunity to purchase stock in the New Bank.

The agreement between the New and Old Banks did not require, suggest, or indicate a corporate merger, reorganization, or consolidation. It merely provided, in substance, for the liquidation of the Old Banks and the establishment of a New Bank. The Plaintiff New Bank, thus formed, has always been an entity completely separate and independent of the Old Banks.

## 2. *Issues Involved*

The issues involved are whether it was "reasonable" for the Commissioner to (1) reject the formula used by the Plaintiff for the determination of additions to its reserve for bad debts and (2) exclude the so-called interbank loans from the base used by the Plaintiff in computing the additions to its reserve for bad debts.

The primary dispute in each instance involves the composition of data for determining the "average bad debt loss experience factor."

### 3. *Statutory & Regulatory Authority*

In 1918, the Congress provided for the deduction from gross income of any debts which became worthless within the taxable year,[1] and in 1921 Congress further provided for the establishment of reserves for bad debts.[2] This latter provision is now embodied in the Internal Revenue Code of 1954, 26 U.S.C.A. § 166 (a) and (c), which reads in part as follows:

"§ 166. *Bad debts*

"(a) *General Rule*

"(1) Wholly worthless debts. * *

"(c) *Reserve for Bad Debts*

"In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. * * *"

The reserve method of treating bad debts was added to our tax law structure because in some instances the "specific charge-off" method proved unrealistic, particularly where long periods of time elapsed between creation of a debt and discovery of its worthlessness. The reserve method is a means of taking an accounting loss in advance of an individual account actually going bad. Additionally, use of a reserve levels the cyclical trend of bad debts so that they are not bunched in "bad times" when income with which to offset them is lowest.

The reserve makes possible a truer reflection of the worth of loans by permitting taxpayers to currently deduct, from present receivables, the bad debt losses which will be incurred in the future, thereby avoiding payment of a tax in the year the debt is incurred when the tax could not be recovered until some future time when the debt goes bad.

Reserves of any sort are not ordinarily deductible, but when Congress goes so far as to depart from the customary practice so as to permit such a deduction, courts have concluded that the deduction allowable only in the discretion of the Secretary or his delegate is as important as the permission. See, C. P. Ford & Co., Inc. v. Commissioner of Internal Revenue, 28 B.T.A. 156 (1933).

The only guide set out in the statute for determining the amount to be deducted for an addition to the reserve for bad debts is that the addition must be reasonable. This rather vague test caused many banks, prior to 1947, to fear the reserve method because of the uncertainty as to what was reasonable and, thus, the prospect of an annual review of additions to the reserve.

Recognizing the difficulty involved, the Internal Revenue Service, beginning in 1947, promulgated special guidelines for the determination of reasonable additions to bad debt reserves. They authorize banks using the reserve method to utilize their historic bad debt loss experience as the criteria for determining what is reasonable.

These special guidelines are set out in mimeograph 6209, 1947–2, Cum.Bull. 26 and Rev.Rul. 54–148, 1954–1, Cum. Bull. 60. Mimeograph 6209, effective in 1947, reads in its most pertinent parts as follows:

"(1) The Bureau has given careful and extended consideration to the situation of banks in general with respect to the use of reserves for bad debts, the proper measure of such reserves, and the amounts to be allowed as deductions.

"(2) In determining a reasonable annual addition to the reserve for bad debts by a bank, it is believed to be fair and sufficiently accurate to resort to the average annual bad debt loss of the bank over a period of twenty years, to include the tax-

1. Revenue Act of 1918, c. 18, 40 Stat. 1057.

2. Revenue Act of 1921, c. 136, 42 Stat. 227.

able year, as constituting a representative period in the bank's history and to accept the equivalent percentage of presently outstanding loans as indicative of the probable annual accruing loss. * * * However, such reserves cannot be permitted to accumulate indefinitely simply because of the possibility that at some future date large losses may be concentrated within a relatively short period of time and operate to absorb the greatest probable reserve. To permit this would sanction the deduction of mere contingency for losses, which is not an allowable deduction for income or excess profits tax purposes. This latter rule makes imperative the imposition of some reasonable ceiling on the accumulation of the reserve other than such indefinite limitation as might eventually prevail under a moving average method.

"(3) The Bureau has accordingly approved the use by banks of a moving average experience factor for the determination of the ratio of losses to outstanding loans for taxable years beginning after December 31, 1946. Such a moving average is to be determined on a basis of twenty years, including the taxable year, as representing a sufficiently long period of a bank's experience as to constitute a reasonable cycle of good and bad years. The percentage so obtained, applied to loans outstanding at the close of the taxable year determines the amount of permissible reserve in the case of a bank changing to the reserve method in such years * * * and the minimum reserve which the taxpayer will be entitled to maintain in future years. * * * A bank, following a change to the reserve method of accounting for bad debts, may continue to take deductions from taxable income equal to the current moving average percentage of actual bad debts times the outstanding loans at the close of the year or an amount sufficient to bring the reserve at the close of the year to the minimum mentioned above, whichever is greater. Such continued deductions will be allowed only in such amounts as will bring the accumulated total at the close of any taxable year to a total not exceeding three times the moving average loss rate applied to outstanding loans. * * *

"(4) In computing the moving average percentage of actual bad debt losses to loans, the average should be computed on loans comparable in their nature and risk involved to those outstanding at the close of the current taxable year involved. Government insured loans should be eliminated from prior year accounts in computing percentages of past losses, also from the current year loans in computing allowable deductions for additions to the reserve. Losses not in the nature of bad debts resulting from ordinary conduct of the present business should also be eliminated in computing percentages of prior losses.

"(5) A newly organized bank, or a bank without sufficient years' experience of computing an average as provided for above, will be permitted to set up a reserve commensurate with the average experience of other similar banks with respect to the same type of loans, preferably in the same locality, subject to adjustment after a period of years when the bank's own experience is established.

* * * * * *

"(8) The term 'banks' as used herein means banks or trust companies incorporated and doing business under the laws of the United States * * *, of any state, or of any territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts."

In effect, the computation under mimeograph 6209 is determined as follows:

(a) The bank computes its bad debt losses for each of the preceding twenty years (including the current taxable year) and applies this to the total loans outstanding at the end of each year.

(b) The twenty loss ratios so obtained are averaged to obtain the average loss ratio. This ratio is known as the "average experience factor."

(c) The bank then adds to its reserves an amount equal to the average loss ratio times the loans outstanding at the end of the current year provided,

(d) That the amount added to the reserve cannot bring the total reserve to more than three times the amount computed in (c) above.

By 1953 the "moving average" method resulted, of course, in a twenty year base period from 1934 through 1953. Suddenly banks discovered that their bad debt reserve was now so large, as determined by the formula, that no additions to the reserve would be likely for many years. The pit of the depression years, with their high losses, no longer formed a part of the base period upon which the formula was determined. Additions to the reserves which had been deemed reasonable, according to the formula in 1947, had become unreasonable according to the same formula as applied in 1953.[2a]

To cope with this situation, the Commissioner adopted Rev.Rul. 54-148, permitting, in light of the experience developed under mimeograph 6209, an alternative method for computing the addition to the bad debt reserve. In lieu of the moving average experience factor provided in the mimeograph, banks were permitted, pursuant to Rev.Rul. 54-148, to use an average experience factor based on any twenty consecutive years of its

own experience after the year 1927. Such factor determines the maximum annual addition to the reserve, provided that the ceiling does not exceed three times the factor as applied to the outstanding loans. It further provides, consistent with mimeograph 6209, that "banks which select a twenty year period which extends back into years for which they have no experience of their own will be permitted to fill in such years" by the use of substituted experience. This, of course, again made available the high loss years of the depression and, in effect, guaranteed that the reserve ceiling would never be less than that allowed in 1947 under mimeograph 6209.

In 1957, the Commissioner further clarified mimeograph 6209 by the issuance of Rev.Rul. 57-350, 1957-2 Cum. Bull. 114, which states that a bank must use its own experience for such portion of the twenty year period during which it was in existence; but that for such portion of the twenty year period during which it was not in existence, it may use substituted experience.

Although the Internal Revenue Service has not quite admitted that it is proceeding against the Plaintiff Bank on the basis of Rev.Rul. 57-350, which was promulgated in 1957, after the years in issue in the instant case (1954-1956), it has nevertheless taken a position identical with the provisions of Rev.Rul. 57-350.

It is this position of the Revenue Service, that is to say, that the Plaintiff must use its own experience for that portion of the twenty year period during its existence which it selects, that provides the central issue of this case.

4. *Statement of Facts and Related Claims*

When mimeograph 6209 became effective in 1947, the Plaintiff, computing

---

2a. Illustrative of the situation is Plaintiff's Exhibit "K", demonstrating that in 1947, when mimeograph 6209 was adopted, the average loss factor (ratio of losses to loans) of Federal Reserve member banks for the twenty year period was .79%. This would have allowed an average maximum reserve of three times this figure or approximately 2.4% of total loans. By 1953, however, the factor was .39% with a ceiling of 1.2%, or a reduction of one-half in six years.

its average loss experience factor for the years 1928–1947, used the loss experience of the two Old Banks for the years 1928 through 1931 and the combined experience of all three Banks (New and Old Banks) for the years 1932 through 1947. However, when Plaintiff's tax return for 1947 was examined several years later, objection was made to the use of the First National and Commercial National Banks' experience for the years 1933 and thereafter, but Union was permitted to use the combined experience of First National and Commercial National for the years 1928 through 1931 and the combined experience of all three banks for the year 1932.

Plaintiff acquiesced in this determination and continued to compute its allowable reserve deductions on the same basis (but using a moving twenty year period) up until the year 1954. (The computation on this basis resulted in an average loss experience factor of .005089 or .5089% and a ceiling of approximately 1½%.)

In preparing its income tax returns for the years 1954–1956, the Plaintiff Bank determined its deductions for additions to its reserve by following the same method, i. e., the combined experience of the Old Banks for the years 1928 through 1931, the combined experience of all three banks for 1932, and the sole experience of the Plaintiff Bank for the following years. This resulted in the same experience factor of .5089%.

The Revenue Service, however, reversed its previous stand and limited use of substituted experience to the loss experience of the First National Bank alone (i. e., excluding the experience of the Commercial National Bank) for the years 1928–1931 and restricted the Plaintiff Bank to its own experience for the years 1932–1947. The computation under this method resulted in a loss experience factor of .0025063 or .25063% upon which the deficiencies for 1954, 1955, and 1956 were based.

As a practical matter, the exclusion of the experience of the Commercial National Bank for 1928 through 1931, from the computation of the borrowed experience allowable to the Plaintiff was of benefit to it since Commercial's loss experience was substantially lower than First National's loss experience.

The bad debt reserve as determined by the Commissioner, the additions thereto, and losses, along with the Plaintiff's claimed additions, were as follows:

| | 1954 | 1955 | 1956 |
|---|---|---|---|
| Reserve bal. close of prior year | $201,821.81 | $196,904.32 | $194,537.45 |
| Less: Net charge-offs during year | 4,917.49 | 2,366.87 | 7,857.83 |
| Balance | 196,904.32 | 194,537.45 | 186,679.62 |
| Allowed additions to reserve | — | — | 54,133.95 |
| Allowed reserve at close of year | 196,904.32 | 194,537.45 | 240,813.57 |
| Claimed additions to reserve [3] | 46,880.30 | 76,543.03 | 162,989.30 |
| Claimed reserve at close of year [3] | 243,784.62 | 317,960.78 | 473,092.25 |

3. As reported by Plaintiff adjusted to reflect correct opening balance.

The discrepancy in figures between the Plaintiff's claims and the Commissioner's allowance revolves primarily around the composition of the figures for the year 1932. Under the Commissioner's theory, the rate of charge-off for 1932 was 0% since the Plaintiff did not suffer any bad debt losses in that year even though it had outstanding more than $12,500,-000.00 in loans. Under the Plaintiff's theory, the rate of charge-off for 1932 was 6.214% since the Old Banks sustained $1,475,441.51 in bad debt losses out of more than $22,000,000.00 in loans.

Plaintiff's case is based on two grounds: (1) That the efforts of the New Bank in 1932, with respect to loans, were concentrated upon the management of the loan portfolios of the two Old Banks of which it was liquidating agent (this experience included unusual or atypical circumstances that would be unlikely to recur); and (2) that Plaintiff's own experience was insufficient to be representative and was of little value in determining a meaningful ratio. Plaintiff urges, then, that the Commissioner was arbitrary, discriminatory, and unreasonable in disallowing the combined experience for 1932.

On the basis of the above-mentioned facts and circumstances, the Plaintiff seeks relief alternatively as follows: (1) Plaintiff says that under the provisions of Section 166(c) of the Internal Revenue Code, it is entitled to a deduction for a reasonable addition to its reserve for bad debts without regard to the provisions of mimeograph 6209 and Rev.Rul. 54–148; or (2) that Plaintiff is entitled under the provisions of mimeograph 6209 and Rev.Rul. 54–148 to an average experience factor of at least .005089 (.5089%) in computing additions to its reserve for bad debts, that such experience factor entitles it to the deductions originally claimed for such years, and that such factor should be calculated

for the years 1928 through 1947 from one of the following sets of data:

(a) The combined experience of the First National and Commercial National Banks of Youngstown for the years 1928 through 1931, and the combined experience of said two banks together with Plaintiff's for the years 1932 through 1947.

(b) The combined experience of the First National and Commercial National Banks for the years 1928 through 1931; the combined experience of the Plaintiff and the said two banks for the year 1932; and the sole experience of the Plaintiff for the years 1933 through 1947.

(c) The experience of the First National Bank for the years 1928 through 1931; for the year 1932, the experience or combined experience of one or more banks in Plaintiff's vicinity, or the average experience of all banks or a representative group of such banks in Plaintiff's Federal Reserve District; and the sole experience of the Plaintiff for subsequent years.

(d) The average experience of all banks in Plaintiff's Federal Reserve District or throughout the United States for the years 1928 through 1947.

### 5. Application of Commissioner's Guidelines to this Case.

To determine the validity of Plaintiff's contentions, the Court must first decide what affect mimeograph 6209 and subsequent rulings has on this case. Plaintiff has contended, *inter alia*, that it is entitled to a reasonable deduction for an addition to its reserve under Section 166(c) of the Internal Revenue Code without regard to mimeograph 6209. This contention has previously been examined by numerous courts with somewhat varying results.[4]

---

4. See First National Bank at Wilkinsburg v. Commissioner, 13 T.C.M. 576 (1954) holding that the mimeograph does not have the force and effect of law.

But see Miners National Bank of Wilkes-Barre v. Commissioner, 33 T.C. 42 (1959); The First National Bank of LaFeria v. Commissioner, 24 T.C. 429 (1955) aff'd 234 F.2d 868 (7th Cir.

Section 166(c) gives the Commissioner broad discretion to determine the reasonableness of a taxpayer's deduction for an addition to its bad debt reserve. Mimeograph 6209 is an expression of the Commissioner's discretion. The courts have not only considered whether a taxpayer can rely on Section 166(c) apart from mimeograph 6209, they have also considered whether the Bureau of Internal Revenue can rely on Section 166(c) apart from mimeograph 6209. The question was aptly put in Pullman Trust & Savings Bank v. United States [5] as follows:

"Whether Mimeo[graph] 6209 itself constitutes the full extent of the Commissioner's exercise of discretion under section 166(c), i. e., whether any addition to a bad debt reserve up to and including the amount sanctioned by the Mimeo[graph] is conclusively presumed to be valid, or whether a computation under the Mimeo[graph] is subject to further review with respect to its reasonableness."

The Tax Court has provided inconsistent answers to foregoing question.[6]

Hopefully, the Pullman Trust [7] case laid the issue to rest by concluding that a computation in accordance with mimeograph 6209 is presumed reasonable, and the burden of disproving its reasonableness rests upon the Commissioner. For the Court to have found otherwise would

return banks to their pre-1947 position when calculations of their bad debt reserves subjected banks to annual reviews for reasonableness despite complete compliance with the Internal Revenue Service's directions.

Therefore, this Court concludes that mimeograph 6209 is the Commissioner's exercise of the discretion authorized by Section 166(c) of the Code; and that although the mimeograph does not have the force and effect of law, it is a rule of general application binding on the Commissioner, and binding on the taxpayer as well by way of rebuttable presumption. It follows, then, that the Union National Bank may rely with confidence on the mimeograph, and that calculations of additions to its reserves made in accordance with the mimeograph are presumed to be reasonable as against the Commissioner. This conclusion is consistent with the Pullman Trust case, discussed infra.

On the other hand, the Government urges that the Pullman Trust case represents a departure from several cases on which it relies as established authorities. These cases,[8] only one of which involves a bank,[9] hold that by utilizing the reserve method for the purpose of bad debt deductions under the Code, a taxpayer subjects himself to the reasonable discretion of the Commissioner; and if the Commissioner's determination as to

1956); American State Bank v. United States, 279 F.2d 585 (7th Cir. 1960) cert. denied 364 U.S. 881, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960), which generally assume the mimeograph to be controlling.

5. 235 F.Supp. 317 (U.S.D.C.N.D.Ill.1963) aff'd 338 F.2d 666 (7th Cir. 1964).

6. Boardwalk National Bank at Atlantic City v. United States (1960) 34 T.C. 937 at p. 946: "Respondent stresses that Section 166 gives him great latitude and discretion in determining the reasonableness of a reserve for bad debts. * * * The fallacy in applying this principle in the instant case, however, is that respondent did exercise his discretion under Section 166 * * * by publishing a revenue ruling of general application granting an election. The

ruling has not been revoked or repudiated. * * *".
Contra: Miners National Bank of Wilkes-Barre. 33 T.C. 42 (1959); Central Bank Co. v. Commissioner of Internal Revenue, 39 T.C. 856 (1963), Remanded 329 F.2d 581 (6th Cir. 1964).

7. Op. cit. supra, Note 5.

8. Art Metal Constr. Co. v. United States, 17 F.Supp. 854, 84 Ct.Cl. 312 (1937); Maverick-Clark Hitho Co. v. Commissioner, 180 F.2d 587 (5th Cir. 1950); S. W. Coe & Co. v. Dallman, 216 F.2d 566 (7th Cir. 1954); American State Bank v. United States, 176 F.Supp. 64 (E.D.Wisc.1959), Aff'd 279 F.2d 585 (7th Cir. 1960).

9. American State Bank v. United States, Supra, Note 8.

amount of addition to the reserve is reasonable, there is no abuse of discretion. This exercise of discretion is not to be lightly set aside. Plaintiff in the instant case admits that he has the "heavy burden" of proving that the Commissioner's exercise of discretion was unreasonable and an abuse of discretion. It is not sufficient for taxpayer to show that his own determination is reasonable.[10] The troublesome point these cases raise viz-a-viz the Pullman Trust case is the purported switch in burden of proof by Pullman Trust from the taxpayer to the Government.

Of the four cases relied on by the Government, only the American State Bank case involves mimeograph 6209 and is the most difficult case with which to reconcile Pullman Trust. (American State Bank will be discussed in more detail, infra.) However, inasmuch as both cases were approved by the Seventh Circuit Court of Appeals, it can be assumed that they are not inconsistent. Reconciliation is possible by reading Pullman Trust to mean that Plaintiff's compliance with the Commissioner's rulings fulfills Plaintiff's "heavy burden." Since the Commissioner's rulings are his exercise of discretion under the Code if the taxpayer complies with these rulings, he has sustained his burden of proof; and it is then incumbent upon the Commissioner to show that the taxpayer's conduct was not reasonable.

It has been determined above that, as to reasonableness, the Commissioner is bound by the exercise of his own discretion in mimeograph 6209 and subsequent rulings. The question now becomes whether the taxpayer in this case has carried its burden of persuading the Court that it has rebutted the presumption of the reasonableness of the Commissioner's rulings.

Mimeograph 6209, as the exercise of the Commissioner's discretion under Section 166 of the Code, was promulgated as a rule of general application to all banks alike. It was intended to prescribe a standard of procedure on the part of banks which would result in the determination of a reasonable addition to the Banks' bad debt reserve. Yet, any general rule when applied literally "across the board" may cause in some instances variances in effect which may be so discriminatory that it amounts to an abuse of discretion. It was noted in S. W. Coe & Co. v. Dallman, 216 F.2d at 569 (7th Cir. 1954) that " * * * a slavish adherence to a formula might, under certain conditions, result in an unreasonable addition to a bad debt reserve, or a failure to make any addition * * * ."

Reviewing for a moment, the reserve method of treating bad debts was created to provide a method for presently anticipating future loss expectations in order to allow a reasonable deduction from the current year's income tax. The Commissioner has determined that as far as banks are concerned, their reserve shall be determined solely by reference to past experience. The purpose of the twenty year experience base in computing the reserve for bad debts, as one court put it,[11] "is to equalize between past bad debt experience and future bad debt expectations so that a particular bank may be recompensed for past losses by bringing the reserve to a maximum figure, before charging the reserve with current losses, and to provide the bank with a cushion adequate to protect it against anticipated future losses."

While the Revenue Service and the courts have continuously said the bad debt reserve is not for mere contingency, they do not appear to have considered that the Commissioner has, in reality, created a contingency fund by his issu-

---

10. Paramount Finance Co. v. United States, 304 F.2d 460, 157 Ct.Cl. 824 (1962).

11. First National Bank of LaFeria v. Commissioner of Internal Revenue, 24 T.C. 429 (1955), Aff'd 234 F.2d 868 (5th Cir. 1956).

ance of mimeograph 6209 and Rev.Rul. 54–148 allowing the use of borrowed experience and the use of the base years 1928 through 1947. Allowing a bank begun in the 1940's–1960's to borrow the experience of a bank in existence during the great depression creates a "fictional, uniform loss ratio for all comparable banks in disregard of the individual business experience and policy of the institutions," which is exactly what one court said should not be done.[12] This borrowed experience often bears little or no relationship to the actual experience of the borrowing bank.

A bank organized in 1948 which has developed fourteen to sixteen years of bad debt experience can completely disregard it, using instead the experience developed by some other bank or banks. The borrowed average experience factor, as a general rule, is so much greater than the Banks' own experience, and bears so little provable relationship to anticipated future losses, that only one conclusion is possible: The use of borrowed experience allows for the buildup, in part, of a contingency fund.

A realistic appraisal of the bad debt reserve, as constituted under the Commissioner's rulings, shows the reserve to be, in part, a contingency fund. It serves no useful purpose to become immersed in semantic distinctions between "mere contingency" and "contingency" funds. All reserves of this nature are contingencies in part. To reason from such a nebulous foundation (distinctions without differences) may very well lead to absurd, discriminatory, or unjust conclusions.

The Commissioner has long been impressed with his caveat against the establishment of "mere contingency" reserves, and, therefore, the thrust of his reasoning is diverted from a fundamental principle of fair taxation—that of providing, as far as possible, equal standards or measures for all who are similarly situated—and his reasoning is then telescoped instead to the matter of the adequacy or reasonableness of the reserve of only the particular bank under examination.

The fallacy of his reasoning, in this regard, lies in the confusion contained in his premise, that is to say, that a fund for mere contingencies is not allowed.

As indicated above, nothing is gained by distinguishing between a contingency, which the reserve obviously contains, and a mere contingency. There is a contingency factor inherent in all bad debt reserves for banks, regardless of the incidence of the date of birth.[13] There is, however, an overwhelming contingency factor included in the reserves allowable to post-depression born banks using substituted experience and to pre-depression born banks using the static twenty year period of 1928–1947. Once this "thicket" is brushed aside, it is easy to conclude that the Commissioner does, in reality, allow mere contingencies.

The real question is not whether a fund for contingencies shall be allowed—all of these reserves contain contingency factors—but, the question must be whether the contingency factor shall be required to be uniform, i. e., measured with the same ruler.

By issuing mimeograph 6209 and Rev. Rul. 54–148, the Commissioner has established for determining the bad debt reserve the use of a twenty year base as "representing a sufficiently long period of a bank's experience as to constitute a reasonable cycle of good and bad years." In other words, it was decided that such period of experience would permit a base broad enough for the determination of a meaningful reserve. When the Commissioner allowed banks to use a static twenty year period encompassing the depression years, he obviously recognized and admitted the importance of

12. American State Bank v. United States, 176 F.Supp. 64, at 70 (E.D.Wisc.1959).

13. This results from the leeway in the reserve ceiling, provided for by the Commissioner's rulings, of three times the allowable annual addition.

these years in determining a reasonable reserve to provide a "cushion" against anticipated future losses. This action only emphasizes the importance of the depression years.

All banks established prior to 1928 can use their own depression experience developed through the backlog of loans made during good times which went bad in the 1930's, and all banks organized during and subsequent to World War II can ignore their own experience and borrow the loss experience of the pre-depression banks.

Clearly, then, only the foregoing banks are entitled to use the significant years of the Great Depression in computing deductions for additions to their reserves, and only those banks born in the depths of the Great Depression are deprived the use of those significant years. This incidence of birth seems to take on a significance of greater magnitude than is necessary or reasonable.

These depression born banks, which naturally exercised conservative management during the depression, and having no backlog of loans from past good years, were deprived by the Commissioner of the large loss experience enjoyed by all other banks. Thus, in the instant case, the Plaintiff is relegated to the use of an experience factor of 0.00% for the year 1932. Whereas if it were allowed the same measure of reasonableness enjoyed by all non-depression born banks, it might, possibly, be using an experience factor as high as 6.214%.

Requiring a depression born bank to use its own experience in the year in which it was organized is a distortion of purpose of the Commissioner's rulings. A bank begun in 1932, 1933, or 1934 can use substituted experience from 1928 until the year of organization, thereby taking advantage of the backlog of loans from good years. Suddenly, however, the bank is cut off from its borrowed backlog and required to use its own experience. But its own experience, standing alone, bears no reasonable relation to its borrowed experience, nor to the experience it will develop in the next few years. The sole purpose of the mimeograph and rulings is to provide a measure for the calculation of a reasonable bad debt reserve. However, it is clear that the year of organization, which must be included in the measure, bears no relationship to past or future years, and is of no help in "equalizing" between past experience and future expectations.

The only satisfactory conclusion to which this Court can arrive is that the Commissioner has allowed the banking community to use twenty years, including depression years, because he is convinced that this period provides at least a meaningful average experience factor for use in determining the reserve for bad debts. Therefore, in the interpretation of mimeograph 6209 and subsequent rulings, the courts should read into the words "own experience" the qualification that the experience must be meaningful. Any other view, it seems, would prevent the determination of a reasonable reserve.

The Commissioner's allowance of the use of substituted or borrowed experience for periods when a bank was not in existence can only be an admission that the borrowed experience is more meaningful or as meaningful. Otherwise, it should not be used.

It is abundantly clear that requiring depression born banks to use their own experience for the organizational year is, to say the least, discriminatory. Such banks are placed at economic disadvantage, and the remaining banks are able to generate more funds and have more money available for loans.

In the instant case, Plaintiff's competitors have average experience factors

not only substantially higher than that allowed to Plaintiff, but higher than that sought by Plaintiff. The following are examples:

| | |
|---|---|
| Mahoning National Bank of Youngstown | .6048% |
| The Peoples Bank of Youngstown | .8937% |
| Dollar Savings & Trust Co., Youngstown | 1.4575% |

These banks, all located within a few blocks of the Union National Bank, have a decided competitive advantage.

It has been held, however, that the presence of discrimination does not amount to unreasonableness.[14]

The propriety of the Commissioner's action depends on whether courts should view reasonableness in the context of the entire banking community, or in the context of only the particular bank under examination.

It would appear that the thrust of the Commissioner's rulings should be to look at the banking community as a whole, and to consider each bank in its relationship to the total industry. When the Commissioner has permitted some banks (those organized after 1947) to use substituted experience for the whole twenty year period, even though they may have many years of their own experience, the tendency is to encourage uniformity in "disregard of individual business experience."

This, however, is not the position taken by the Commissioner nor by the courts. The courts, as a general rule, have viewed the reasonableness of the Commissioner's action in light of the complaining Banks' own bad debt experience. "The standard of reasonableness of annual additions to reserves is predicated on the adequacy of amounts allowed to offset charge-offs and to accumulate reserves sufficient to absorb reasonably anticipated bad debt losses."[15] Illustrative of this treatment is the Seventh Circuit's statement in the American State Bank case, 279 F.2d at 589, "The reserve ac-

count for bad debts was held to be 'reasonable and adequate under the evidence' and not 'because the Commissioner reached the result by the use of a formula.'"

While it is the finding of this Court that discrimination exists in the Commissioner's treatment of the Plaintiff Bank in the instant case, the trial court in the American State Bank[16] case considered it to be irrelevant in testing the reasonableness of the Commissioner's determination. The Court said in 176 F. Supp. at 70:

"While the record here does not support a finding of present or anticipated future losses which establish the insufficiency of the allowed addition to reserves or of the inadequacy of the accumulated reserve, it nevertheless demonstrates the Bank's disadvantageous position in respect to deductions from income for tax purposes relative to comparable [Milwaukee] banks.

"Commissioner's application of the method proposed in pertinent Rulings results in substantially larger proportionate deductions being available to banks having sustained heavy losses and to those organized subsequent to the heavy loss years than to banks newly organized during these years. Such deductions may be justified in case of banks actually having sustained proportionate losses. However, the disparity between the position of hypothetical banks which had no experience since they were not in existence

14. American State Bank v. United States, op. cit. supra, Note 8.

15. American State Bank v. United States, 176 F.Supp. 64 at 69 (1959).

16. American State Bank v. United States, op. cit. supra, Note 8.

and that of plaintiff Bank which had little or no experience for several of the heavy loss years due to its newness and economic factors but is denied the use of substitute loss experience, may result in the application of the Commissioner's formula in a discriminatory manner.

"Tax disadvantages and potential discrimination have not been considered pertinent factors in judging the reasonableness of the Commissioner's determinations as to the additions to reserves."

In the instant case, as in the American State Bank case, the deductions allowed by the Commissioner for additions to the bad debt reserve are not inadequate when they are based only on the Plaintiff Bank's own experience. But, this Court, with much reluctance to disagree, is unable to hold that such finding is dispositive of the real issue.

To test the "reasonableness" of the Commissioner's determination in the manner urged in the instant case (and in the American State Bank case) seems to avoid the real issue involved, and to eliminate an essential ingredient of justice, or fair taxation. It is most difficult to understand how the Commissioner's determination can be reasonable when, inherently, it constitutes preferential treatment for some banks, which can easily be corrected. Under the circumstances, it seems to "run against the grain" to view the Plaintiff Bank as if no other existed, and to hold that, notwithstanding manifest discrimination against this bank, the Commissioner has been reasonable. The Plaintiff is a part of a community of banks and should be viewed in the context of the community in which it lives. To do less than is here indicated, is to condone unnecessary inequality of treatment, and amounts to less than justice.

Therefore, it is concluded that the Commissioner has abused the discretion conferred upon him under Section 166(c) of the Internal Revenue Code of 1954 in disallowing the Bank's claimed additions to its reserve for bad debts in each of the years 1954, 1955, and 1956.

The final issue to be determined lies in the Plaintiff Bank's contention that the Commissioner's refusal to exclude the two interbank loans from the Plaintiff's base in computing its loss experience factor is unreasonable.

The Plaintiff Bank contends that mimeograph 6209 and Rev.Rul. 54–148 require that only loans "comparable in their nature and risk * * * to those outstanding at the close of the current taxable year," be included in computing the average experience factor. The Bank urges that the interbank loans are not comparable in nature and risk to their other loans and should, therefore, be excluded from their loan base.

When the Plaintiff Bank was organized in 1932, part of the agreement creating the Union National Bank called for the Old Banks to give notes, in the amount of the liabilities which had been assumed, to the Plaintiff Bank. The Plaintiff argues that these notes were not ordinary loans but represented the purchase price paid to the predecessor banks, i. e., the consideration paid for their business.

The interbank notes, which originally totalled approximately $22,000,000.00, were reduced by about one-half by the end of 1932. This was accomplished by transferring the liquid assets from the Old Banks to the Plaintiff Bank and crediting the value thereof against the notes. The remaining $11,000,000.00 obligation was satisfied primarily by Plaintiff's collection, as liquidating agent, of the outstanding loans of the Old Banks.

The interbank notes, from their inception until they were fully repaid, were carried by the Plaintiff Bank in its loans outstanding account; and it should be noted at this point that the Plaintiff included these interbank loans in its own computations of its loan base, and made no claim with regard to the interbank loans until after the original notice of deficiency was made.

The simple answer to the Plaintiff's contention is contained in its own brief, wherein it states:

"Technically, Plaintiff was not collecting its own loans when it acted as liquidating agent of the predecessor banks; practically, it was, since every repayment on one of the loans of a predecessor bank was, by the terms of the liquidating agreements, credited upon the indebtedness of the predecessor bank to Plaintiff."

Practically speaking then, the interbank notes were merely the paper formalities evidencing the Plaintiff Bank's assumption of the outstanding loans of the Old Banks. The obligation incurred by the Old Banks to the New Bank were supported by the outstanding loans of the Old Banks. The notes were nothing more than the evidence of this obligation.

When this Court views the interbank loans in the context of the agreements creating the New Bank, it can only reach the conclusion that the interbank loans were, in reality, the same as the commercial loans of the Old Banks and were, therefore, comparable in their nature and risk to the loans of the Plaintiff Bank.

Thus, it is concluded that the Plaintiff Bank's contention that the interbank loans be excluded from the Plaintiff's loan base is not well taken, and that the Commissioner did not abuse his discretion under Section 166(c) of the Internal Revenue Code of 1954 in refusing to exclude them.

Accordingly, the Court concludes that the Commissioner's denial of the use of substituted experience in determining the deduction for additions to the Plaintiff Bank's reserve for bad debts for the years 1954, 1955, and 1956 was unreasonable and, therefore, an abuse of the discretion granted the Commissioner under Section 166(c) of the Internal Revenue Code of 1954. The Plaintiff Bank is entitled to the use of substituted experience of the Old Banks for the year of organization, 1932, in computing its average experience factor under mimeograph 6209 and Rev.Rul. 54–148. Under the circumstances of this case, application of Rev.Rul. 57–530 to the Plaintiff Bank requiring it to use its own experience for the years it is in existence is unreasonable in regard to 1932, the year of organization of the Plaintiff Bank.

The foregoing memorandum opinion constitutes the findings of fact and conclusions of law required by the Federal Rules of Civil Procedure, Rule 52(a).