**AKRON NATIONAL BANK AND TRUST COMPANY,**
Plaintiff-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellant.

No. 74–1612.

United States Court of Appeals,
Sixth Circuit.

Feb. 18, 1975.

**1158**

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Michael Paup, Ann Belanger Durney, Tax Div.–Dept. of Justice, Washington, D. C., Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, for defendant-appellant.

John M. Glenn, Buckingham, Doolittle & Burroughs, Sam D. Bartlo, Akron, Ohio, for plaintiff-appellee.

Before CELEBREZZE and LIVELY, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

This appeal presents the question whether certain funds should have been added to Appellee Bank's bad debt reserve for the purpose of calculating its 1968 deduction under section 166(c), Int. Rev.Code of 1954, 26 U.S.C. § 166(c) (1967). The Commissioner of Internal Revenue determined that funds undisbursed under construction loan agreements as of December 31, 1968 should not have been included within Appellee's 1968 base of outstanding loans, used to calculate its bad debt reserve for that year. The District Court disagreed and ordered a refund.

This dispute involves a number of construction mortgage loans signed in 1968, under which portions of the borrowed funds were not disbursed by Appellee until 1969. Each construction loan began with the approval of the Borrower's mortgage loan, followed by the execution of a Loan Agreement. Thereafter, the Borrower executed a Mortgage Note for the face amount of the loan and a Mortgage Deed securing the note. At this point funds were not disbursed to the Borrower. Rather, the Loan Agreement governed disbursement.

The Loan Agreement required the Borrower to construct buildings on the mortgaged land according to submitted plans, with changes to be permitted only with the Bank's consent. The Bank held the loan proceeds in a "Due to Borrower" account and did not pay out funds until presented with vouchers "payable to subcontractors, contractors, and materialmen only" and until "the services and/or materials for which they have been given have been actually installed or completed." The Bank agreed to check for defects in materials and services under the construction contract. Most significantly for the question before us, the following provisions appear in the Loan Agreement:

5. Borrower agrees that in the event:

(a) There has been any improvement made on the premises at the

time when the mortgage is filed with the Recorder;

(b) There is any breach of any of the terms or conditions of this agreement or of the mortgage deed or the promissory note referred to above;

(c) There are any false representations made by Borrower to Bank;

(d) Any voucher is submitted at any time which Borrower knows has not been earned by performance by the payee for materials or for services used in or furnished for the building(s) on the aforementioned land;

(e) Any cessation occurs at any time in construction of the building(s) for more than one week except for strikes, riots, or other causes beyond Borrower's control or any substantial change is made in construction thereof from that provided by plans or changes in plans as approved by Bank in writing;

(f) The cost to complete said building(s) as estimated by Bank in good faith at any time appears likely to exceed the balance of funds retained by it in Borrower's special account after deducting from the amount thereof the total of unpaid vouchers outstanding;

(g) Borrower is adjudged bankrupt, suffers the appointment of a receiver, files a petition under Chapter XI of the Bankruptcy Act, or

(h) Borrower requests a termination of the loan, or confesses inability to continue construction,

Then, Bank may immediately and without notice declare the loan and mortgage deed securing such loan to be in default, apply all sums remaining in Borrower's special account to the principal amount of the mortgage indebtedness, and accelerate the balance remaining for payment immediately.

Failure of Bank to assert a default shall not be deemed a waiver of its right to do so at any time thereafter.

6. This Agreement inures only to the benefit of the Bank and Borrower and to no other persons. In particular, failure of the Bank to pay any vouchers submitted for payment of services and/or materials for sub-contractors, materialmen, and/or contractors, shall not give rise to any action or claim on their behalf under this agreement or otherwise.

Thus, the Borrower did not have complete control of funds which the Bank had agreed to lend the Borrower upon the signing of the mortgage. The funds remained in the Bank and did not constitute property rights of contractors or others until actually disbursed. If an event specified in term (5) of the Loan Agreement occurred, the undisbursed funds could have been retained by the Bank and applied to reduce the principal amount of the Borrower's debt.

For 1968 [1] Appellee reported a bad debt deduction on its federal income tax return under the procedure set forth in Revenue Ruling 65–92, 1965–1 Cum. Bull. 112. [2] This ruling clarified the option available to banks which chose to deduct for bad debts under section 166(c), Int.Rev.Code of 1954. Rather than having to take a deduction for bad debts in the years they became worthless under section 166(a), banks were allowed to deduct the amount necessary to maintain a reserve for bad debts at 2.4 percent of their total "outstanding loans" at the end of each taxable year.

In 1968 Appellee made an addition to its bad debt reserve of $432,661.99 and claimed this as a deduction. Included within the base of "outstanding loans" used to calculate this figure was the total amount of construction mortgage loans signed and outstanding as of December 31, 1968, including funds re-

---

1. In 1968 Appellee reported its income on the calendar year and accrual basis.

2. The Tax Reform Act of 1969 deprived banks of this option through the enactment of sec-

tion 585, effective for taxable years beginning after July 11, 1969, § 431(d), 83 Stat. 618 (1969).

tained by the Bank in "Due to Borrowers" accounts.

The Commissioner of Internal Revenue determined that the funds remaining in "Due to Borrowers" accounts on December 31, 1968, should not have been considered in computing the base of "outstanding loans". Thus, the Commissioner reduced the amount of "outstanding loans" by $1,723,791.29, disallowed $41,370.99 of Appellee's reported addition to its bad debt reserve (and, accordingly, the same amount of its bad debt deduction), and assessed a deficiency of $21,843.88 for 1968. Appellee paid the deficiency, plus interest, filed an unsuccessful refund claim, and then sued for a refund.

The District Court, upon consideration of factual stipulations, briefs, and the testimony of two of Appellee's officials, determined that the entire amount of funds committed under construction mortgage loan agreements outstanding as of December 31, 1968 was includable in the base of loans outstanding at the end of Appellee's 1968 taxable year. It ordered Appellant to refund $23,882.15, the amount paid by Appellee to cover the deficiency, plus interest.

■ The basic question for decision is whether the Commissioner's determination of an allowable addition to Appellee's bad debt reserve for 1968 was reasonable. Paramount Finance Co. v. United States, 304 F.2d 460, 464, 157 Ct.Cl. 824 (1962). When a bank elects to report its bad debt deductions by the reserve method, it subjects itself to the reasonable discretion of the Commissioner in limiting annual additions to its reserve for bad debts, under section 166(c), which provides: "In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts."

This section "gives the Commissioner of Internal Revenue great discretion." Central Bank Co. v. Commissioner, 329 F.2d 581 (6th Cir. 1964). In exercising his discretion, the Commissioner promulgated Revenue Ruling 68–630, 1968–2 Cum.Bull. 84, which clarified what was includable within the base of "outstanding loans", for the purpose of computing an addition to a bank's bad debt reserve. "Cash collateral" was not to be includable:

Sec. 4. Cash Collateral.

Revenue Ruling 63–122, C.B. 1963–2, 98, holds, in part, that for the purpose of computing reasonable annual additions to its reserve for bad debts a bank is required to decrease the face amount of installment loans outstanding by the amount of any so-called "hold back" accounts related to such installment loans. As described in that ruling "hold back" accounts are in the nature of guarantee deposits left with the bank by dealers discounting installment paper. Revenue Ruling 63–122 also is applicable to the extent that a lending bank has collected and retained cash derived from collateral pledged to the bank and to the extent that loan payments made by a borrower are maintained in a separate account and are not immediately credited to the outstanding loan balance.

The underlying concept behind Revenue Ruling 63–122 is applicable to other situations in which a lending bank has rights in specific cash items or cash balances under its control such as when a lending bank receives collateral in the nature of cash on deposit in the lending bank that is represented by a passbook, certificate of deposit, or other similar instrument.

An outstanding loan otherwise eligible for inclusion in the loan base is not affected by the fact that a borrower is required, by virtue of an arrangement with the lending bank, to maintain a minimum, average, or compensating balance in a demand deposit account within the lending bank while the loan is outstanding. An overdraft in one or more deposit accounts of a customer is an outstanding loan eligible for inclusion in the loan base whether or not

other deposit accounts of the same customer have balances in excess of the overdraft.

Loans secured by collateral such as passbooks, certificates of deposit, or other similar instruments representing cash on deposit in a bank (as defined in section 581 of the Code) or in a branch or agency of a foreign bank engaged in the banking business in the United States that may be entitled to compute the addition to its reserve for bad debts under Revenue Ruling 65–92 (see Revenue Ruling 68–524), other than the lending bank, must be excluded from the loan base to the extent that the lending bank may control withdrawal of such cash deposits. These principles do not apply to collateral representing sums held by non-banking institutions.

The District Court reasoned that each of the construction loans was eventually completed and "became a conventional real estate mortgage loan." It found that if a borrower were to default on a construction loan, as a practical matter the Bank would "under most circumstances be compelled to assume the responsibility of completing the construction with the undisbursed funds." Since the undisbursed funds were effectively committed to completing the construction "once disbursement of funds begins, . . . [t]he undisbursed construction loan funds in the due to borrowers' account are not equivalent to cash collateral, and do involve a risk of loss."

■ The question before us is not whether this view of section 166(c) and Revenue Ruling 68–630 is reasonable. Rather as stated above, it is whether the Commissioner's view is reasonable. As the Court stated in Paramount Finance Co. v. United States, 304 F.2d 460, 464, 157 Ct.Cl. 824 (1962):

Certainly the plaintiff has shown that the method it used in determining the amount to be added to its bad debt reserve was reasonable, but this is irrelevant. It does not follow that if the plaintiff was reasonable in its de-

termination the defendant was unreasonable.

*See also* Dixie Furniture Co. v. Commissioner, 390 F.2d 139, 141–42 (8th Cir. 1968); American State Bank v. United States, 279 F.2d 585, 589 (7th Cir.), cert. denied, 364 U.S. 881, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960).

■ The Commissioner determined that funds undisbursed from construction loan "Due to Borrowers" accounts were not includable within the total of "loans outstanding." We are convinced that this determination was reasonable and was not an abuse of the Commissioner's discretion under section 166(c).

Under each Loan Agreement, the Borrower agreed that if any of eight events (including default) occurred, the "Bank may immediately and without notice . . . apply all sums remaining in Borrower's special account to the principal amount of the mortgage indebtedness. . . . " The undisputed testimony of Appellee's vice president in charge of mortgage loans shows that the Bank understood this provision to give the undisbursed funds the status of cash collateral:

> THE COURT: Well, you use your own terms. Under what circumstances would the contract not be completed and money be left in that account?
>
> THE WITNESS: Where the borrower would be insolvent and the loan would go in default with no hope of repayment. Then we would have the legal right at that point to use that money as a cash collateral offset.

The Bank's loans were secured in cash to the extent of the undisbursed funds.

The District Court rejected the reasonableness of the Commissioner's position by concluding that the construction loan agreements were "indivisible." While it may be true as a practical matter that the "loan funds move[d] continually towards a condition of full distribution," on December 31, 1968 a significant portion had not been distributed and did represent "cash collateral." The loan

agreements were legally divisible in time. Even for an accrual taxpayer such as Appellee, "A liability does not accrue within a given taxable year unless the final event which fixes the amount and determines the liability of the taxpayer to pay occurs within that year." Fourth Ave. Amusement Co. v. Glenn, 201 F.2d 600, 605 (6th Cir. 1953). *See also* Loewi & Co. v. Commissioner, 232 F.2d 621, 624–25 (7th Cir. 1956); Milton Bradley Co. v. United States, 146 F.2d 541 (1st Cir. 1944). The undisbursed funds did not lose their character as cash collateral until disbursed in 1969, and any bad debt deduction was properly taken only in that year.

A different case might be presented if the undisbursed funds were completely within the borrowers' control and were merely held by the Bank in a checking deposit or savings account. *See, e. g.,* First Trust & Savings Bank of Davenport v. United States, 301 F.Supp. 194, 197 (S.D.Iowa 1969), where "once the [Bank] credits the special account in a customer's name, the funds are immediately available for disbursement on the order of the borrower, and the [Bank] exercises no control over said funds, other than to retain physical possession thereof within the confines of the bank." But here the Bank retained the right to apply undisbursed funds against the principal indebtedness of defaulting borrowers.

A contrary holding would require the Commissioner to make a factual inquiry into the probabilities that funds with the legal status of cash collateral are risked as a practical matter when a loan agreement is signed, and should therefore not be treated as cash collateral. Such inquiry, taking an "all-or-nothing" view of each loan agreement, is not required. First American National Bank of Nashville v. United States, 327 F.Supp. 675 (M.D.Tenn. Feb. 16, 1971). *See also* Rev. Rul. 63–122, 1963–2 Cum. Bull. 98. *Cf.* Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

We hold that the Commissioner reasonably determined, within his discre-tion, that construction mortgage loan funds undisbursed as of December 31, 1968, should not have been included in Appellee's base of outstanding loans when computing the 1968 addition to its bad debt reserve.

Accordingly, the judgment of the District Court is reversed, and the cause is remanded for entry of an appropriate order.